132

KRAUSE, ADMR., APPELLEE, *v.* THE STATE OF OHIO, APPELLANT.

(No. 71-779—Decided July 19, 1972.)

*Messrs. Sindell, Sindell, Bourne, Markus, Stern & Spero, Mr. Steven A. Sindell* and *Mr. Robert Begam,* for appellee.

*Mr. William J. Brown,* attorney general, *Messrs. Crabbe, Brown, Jones, Potts & Schmidt, Mr. Charles E. Brown, Mr. Robert S. Howarth, Jr., Mr. A. L. Gretick* and *Mr. Daniel M. Collett,* for appellant.

O'NEILL, C. J.   The ultimate issue is whether an action based on tort is properly maintainable against the state of Ohio when it has not consented to such suit.   Based on precedent, this issue would seem to be foreclosed against appellee.   See *Raudabaugh* v. *State* (1917), 96 Ohio St. 513, 118 N. E. 102, wherein paragraph one of the syllabus states:

"A state is not subject to suit in its own courts without its express consent."

Paragraph two of that syllabus states:

"The provision of the Ohio Constitution, Article I, Section 16, as amended September 3, 1912, that 'Suits may be brought against the state, in such courts and in such manner, as may be provided by law,' is not self-executing; and statutory authority is required as a prerequisite to the bringing of suits against the state."

See, also, paragraphs one and two of the syllabus in *Palumbo* v. *Indus. Comm.* (1942), 140 Ohio St. 54, 42 N. E. 2d 766; paragraph one of the syllabus in *State, ex rel. Williams,* v. *Glander* (1947), 148 Ohio St. 188, 74 N. E. 2d 82; and paragraphs two and four of the syllabus in *Wolf* v. *Ohio State Univ. Hospital* (1959), 170 Ohio St. 49, 162 N. E. 2d 475.

However, because appellee challenges the correctness of those cases as precedent for such a ruling, and because the majority of the court below found that "the doctrine of sovereign immunity cannot be supported in Ohio in the light of the history of Article I, Section 16," and because of the widespread criticism of it, the doctrine of governmental immunity in Ohio will be re-examined herein.

The Constitutions of 1803 and 1851 were silent on the question of governmental immunity, but case law by this court clearly shows that it existed in Ohio.   See *State* v. *Franklin Bank of Columbus* (1840), 10 Ohio 91; *Miers* v. *Zanesville and Maysville Turnpike Co.* (1842), 11 Ohio 273; and *Seely* v. *State* (1842), 11 Ohio 501, affirmed, 12 Ohio 496.   Thus, the doctrine had a judicial origin.

In 1850, a constitutional convention was convened for

the purpose of amending the Constitution of 1803. Delegate Woodbury presented the convention with the following proposal:

"When any claim or demand shall be presented to the General Assembly, and one-fourth of the members elected to either branch thereof, shall be opposed to the allowance of such claim or demand, the General Assembly shall then and forever thereafter, be prohibited from allowing the same, but provision shall be made by law for the prosecution in the courts of law and equity, of all claims or demands against the state." Vol. 2, Debates and Proceedings of the Constitutional Convention of 1850, page 182.

Speaking on behalf of the amendment, Delegate Woodbury stated:

"We are all aware that claims are submitted to the Legislature, about which we have no means of ascertaining whether they are correct or not, because the evidence we have is merely *ex parte*. The allowances depend generally more upon the men who advance the claims than the justice of the claims. * * * Claims have been brought here which parties would never think of applying to a court to enforce * * *."

He also argued that:

"Of all bodies in the world the Legislature is the poorest to settle disputes about claims." *Id.*, Vol. 1, page 297.

Delegates opposing the amendment argued that the state was immune to suit and to allow it to be sued would be "no case at all—there is no possibility of a fair trial, with the state on the one side and an individual on the other." The "State * * * will always be 'plucked' in the absence of * * * protection in some shape." *Id.*, Vol. 2, page 182.

When the debate was over Delegate Woodbury withdrew the proposal and governmental immunity remained the law of Ohio. *Id.*, Vol. 1, page 298. The amendment was ultimately rejected by the Convention on December 26, 1850. *Id.*, Vol. 2, page 182. Private claims against

the state were redressed only by petition to the General Assembly, as was done prior to 1850. Subsequent thereto, this court again reaffirmed the doctrine of governmental immunity in Ohio. See *State, ex rel. Parrott,* v. *Bd. of Public Works* (1881), 36 Ohio St. 409, 415, and *State, ex rel.,* v. *Cappeller* (1883), 39 Ohio St. 207. Thus, for approximately 100 years prior to the amendment of Section 16 of Article I, this court had consistently held that the state of Ohio could not be sued without first having expressly consented to such suit.

At the 1912 Constitutional Convention, Delegate Weybrecht introduced Proposal No. 252, which was entitled "Providing for redress of claims against the state." Vol. 1, Proceedings and Debates of the Constitutional Convention of 1912, at page 249. The proposal was referred to the Committee on Judiciary and Bill of Rights. *Id.,* Vol. 1, page 318. It was reported out by that committee in the following language:

"Suits may be brought against the state, in such courts, and in such manner, as may be directed by law." *Id.,* Vol. 2, page 1431.

Speaking on behalf of the proposal, Delegate Weybrecht stated:

"The proposal * * * recognizes the right of the individual to seek redress for claims against the state in such courts *as may hereafter be designated,* without petitioning the Legislature as is now the custom." (Emphasis added.) *Id.,* Vol. 2, page 1431.

Delegate Weybrecht referred to other jurisdictions whose then present procedure was in accord with Proposal No. 252:

"In our national government this ancient attribute of sovereignty was overthrown many years ago when *Congress conferred on a special court* the adjudication of all claims of the individual against the general government.

"Today the states of Pennsylvania, New York and Connecticut, through their constitutions, *confer on the*

*Legislature, as does this proposal, the right to designate the tribunal* in which redress may be sought.''

''* * * why should the Legislature appropriate the people's money in settlement of claims against the state of dubious and uncertain origin and *without the intervention of courts*?'' (Emphasis added.) *Id.*, Vol. 2, page 1431.

The proposal passed with near unanimous approval and was referred to the Committee on Arrangement and Phraseology. *Id.*, Vol. 2, page 1432. That committee changed the title to ''Suits against the state'' and changed the phrase ''as may be directed by law'' to ''as may be provided by law.'' *Id.*, Vol. 2, page 1797.

At the third reading, Delegate Hoskins spoke on behalf of the proposal:

''This section * * * permits a suit to be brought against the state *in a manner to be provided by law. * * ** The Legislature ought to have a right to *provide by law* for the adjustment of controversies between its citizens and the state. *That is the sole purpose of this proposal.''* (Emphasis added.) *Id.*, Vol. 2, page 1919.

Delegate Woods objected to the proposal, stating: ''If this door is thrown open it will be a great expense to the state. The cases will have to be tried by juries in the local county and the idea will be that 'The state has a lot of money and we will make the state pay.' '' *Id.* However, the amendments were agreed to and the proposal passed as amended by the Committee on Arrangement and Phraseology. *Id.*, Vol. 2, page 1960.

When drafting the explanation to the people, Delegate Hoskins questioned whether the explanation to Section 16 of Article I conveyed ''the idea that legislation is necessary to confer that right or is the right given by the article itself? * * * *The amendment says that the Legislature shall provide the method of bringing suit.* Will the amendment itself confer the right to bring the suit?'' (Emphasis added.)

Delegate Peck stated: ''The amendment does confer that right.'' *Id.*, Vol. 2, page 2028.

While this court agrees with the court below that the amendment should be read in light of its history,[1] this court is compelled to disagree that had the court in *Raudabaugh, supra* (96 Ohio St. 513), considered the history it would have reached an "entirely different conclusion."

The doctrine of governmental immunity was a complete defense to any suit brought against the state without its consent, and the delegates were certainly apprised of that fact. The issue for them was not whether to abrogate governmental immunity, but what was the best method for allowing suits against the state. The history of Section 16 of Article I shows that they empowered the General Assembly to determine in what manner and in what courts suits should be brought. Such was the prevailing constitutional procedure at that time.[2]

In the *Raudabaugh case, supra* (96 Ohio St. 513), this court examined similar constitutional provisions of various states and concluded that there was no material difference between them and Section 16 of Article I.

For example, Section 27, Article IV of the Wisconsin Constitution, provides:

"The Legislature shall direct by law in what manner and in what courts suits may be brought against the state."

The Wisconsin Supreme Court held that governmental immunity was abolished but that the constitutional provision "has no effect upon the state's sovereign right un-

---

[1]See *Castleberry* v. *Evatt* (1946), 147 Ohio St. 30, 67 N. E. 2d 861; *Cleveland* v. *Board of Tax Appeals* (1950), 153 Ohio St. 97, 91 N. E. 2d 480, and *State, ex rel. Wallace,* v. *Celina* (1972), 29 Ohio St. 2d 109, 279 N. E. 2d 866.

[2]No significance is gleaned from the fact that the delegates proposed to amend Section 16 of Article I rather than another provision, or to propose it as a separate provision. The original Section 16 of Article I was adopted in 1803, and, except for the amendment, has remained unchanged. It appears that this provision was amended because other states with similar constitutional provisions either amended their comparable provision or adopted it intact. See, *e. g.,* Del. Const., Section 9, Article I; Pa. Const., Section 11, Article I; and Tenn. Const., Section 17, Article I.

der the Constitution to be sued only upon its consent."
*Holytz* v. *Milwaukee* (1962), 17 Wis. 2d 26, 41, 115 N. W.
2d 618. Its constitutional provision is not self-executing.
*Forseth* v. *Sweet* (1968), 38 Wis. 2d 676, 158 N. W. 2d 370.
See, also, *Chart* v. *Gutmann* (1969), 44 Wis. 2d 421, 171 N.
W. 2d 331, certiorari denied, 397 U. S. 973.

The court in *Raudabaugh* also compared Section 16
of Article I, to Section 6 of Article XX of the California
Constitution, which provides:

"Suits may be brought against the state in such man-
ner and in such courts as shall be directed by law."

In *Muskopf* v. *Corning Hospital Dist.* (1961), 11 Cal.
Rptr. 89, 92, 359 P. 2d 457, 460, the California Supreme
Court rejected a contention that the amendment estab-
lished a substantive rule of immunity and stated:

"If the section has any substantive significance it
would appear to be a waiver of immunity."

The court, at page 93, held "that Article XX, Section
6 provides merely for a legislative consent to suit." In
other words, Section 6 was not self-executing.

Kentucky was another jurisdiction relied upon by the
court in *Raudabaugh*. Section 231 of the Kentucky Con-
stitution provides:

"The General Assembly may, by law, direct in what
manner and in what courts suits may be brought against
the Commonwealth."

Section 231 is not self-executing.

"* * * the constitutional section in question has always
been very explicit. The word 'may' in Section 231 indi-
cates that suits against the commonwealth may be brought
as a matter of legislative grace. * * * Only by authority of
an enactment of the Legislature may such suit be brought,
and then the manner of bringing a suit and the court in
which it may be brought must be directed." *Foley Con-
struction Co.* v. *Ward* (Ky. 1964), 375 S. W. 2d 392, 396.
See, also, *Dept. of Revenue* v. *Jack Cole Co.* (Ky. 1971),
474 S. W. 2d 70, 72.

Similarly, the constitutional provisions of Nebraska

(Section 22, Article V) and Tennessee (Section 17, Article I) state, respectively: "The state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought," and "suits may be brought against the state in such manner and in such courts as the Legislature may by law direct."

While inroads on the doctrine of governmental immunity have been made in other areas (see *Brown* v. *Omaha* [1968], 183 Neb. 430, 160 N. W. 2d 805 [cities and political subdivisions] and *Johnson* v. *U. of Omaha* [1969], 184 Neb. 512, 169 N. W. 2d 286 [municipal universities]), it is still the law in Nebraska that Section 22 of Article V "permits the state to lay its sovereignty aside and consent to be sued on such terms and conditions as the Legislature may prescribe. This provision of the Constitution is not self-executing. Legislative action is necessary to make it available." *Gentry* v. *State* (1962), 174 Neb. 515, 517, 118 N. W. 2d 643.

The Supreme Court of Tennessee, in *Brewington* v. *Brewington* (1965), 215 Tenn. 475, 387 S. W. 2d 777, stated: "* * * we think it important and significant to outline the rights of the state * * * as a sovereign. According to Article I, Section 17 * * * suits may be brought against the state in such a manner and in such courts as the Legislature may by law direct, and in no other manner."

Because it could find no express consent to the suit, it dismissed the state as a party defendant.

The court in *Raudabaugh* also compared Section 16 of Article I to Section 26 of Article II of the Washington Constitution:

"The Legislature shall direct by law, in what manner, and in what courts, suits may be brought against the state."

Of Section 26, Article II, the Washington Supreme Court stated that "it was left to the Legislature to determine in what courts such suits should be brought, and to prescribe the method of procedure." *Northwestern and Pac. Bank* v. *State* (1897), 18 Wash. 73, 50 P. 586. The Washington Legislature has enacted such enabling legis-

lation. See Laws of 1963, Ch. 159, 752; R. C. W. 4.92.010 *et seq.*

To the list of jurisdictions cited by the court in *Raudabaugh*, whose constitutional provisions are similar to Section 16 of Article I, and whose courts hold they are not self-executing, could be added at least the following: Arizona,[3] Delaware,[4] Indiana,[5] Nevada,[6] North Dakota,[7] Pennsylvania,[8] South Dakota,[9] and Wyoming.[10]

[3]Section 18, Article IV, Pt. 2. As early as 1913 the Arizona Legislature enacted what is now Section 12-821, A. R. S., which provided that persons having claims against the state for negligence could bring such action against the state and prosecute it to final judgment. Thus, when the Arizona Supreme Court abrogated governmental immunity it was able to do so because it was truly a judicial doctrine and its constitutional provision was no barrier. See *Stone* v. *Arizona Highway Comm.* (1963), 93 Ariz. 384, 381 P. 2d 107, and *State* v. *Stone* (1969), 104 Ariz. 339, 452 P. 2d 513.

[4]Section 9, Article I "The Constitution, itself, prescribes the method of waiving or limiting the defense of sovereign immunity. This is no less binding on the courts than any other branch of the government." *Shellhorn* v. *State* (1962), 55 Del. 298, 187 A. 2d 71, 74. See, also, *George & Lynch* v. *State* (1964), 197 A. 2d 734.

[5]Section 24, Article IV. " 'Consent to be made a party in such a proceeding can be given by the state only by a legislative enactment clearly evincing such consent.' " *State* v. *Young* (1958), 238 Ind. 452, 458, 151 N. E. 2d 697.

[6]Section 22, Article IV. The constitution itself provides the procedure for bringing suits against the state and "the obvious implication is that without such a consent the sovereign cannot be sued." *Hardgrave* v. *State* (Nev. 1964), 389 P. 2d 249, 251.

In 1965, the Nevada Legislature enacted N. R. S. 41.031 and partially waived its immunity. See *State* v. *Silva* (Nev. 1970), 478 P. 2d 591.

[7]Section 22, Article I. Paragraph four of the syllabus in *Fetzer* v. *Minot Park Dist.* (N. D. 1965), 138 N. W. 2d 601, states: "Courts cannot legislate. Their power is limited to passing on laws enacted by the Legislature, and, if the Legislature fails to act, courts cannot change the law by judicial decision." See, also, *Kaczor* v. *Minot* (N. D. 1965), 138 N. W. 2d 784.

[8]Section 11, Article I. "So far as Pennsylvania's courts are concerned, it is only as the Legislature may by law direct that suits may be brought against the commonwealth." *Commonwealth* v. *Berks County* (1950), 364 Pa. 447, 449, 72 A. 2d 129. See, also, *Bannard* v. *N. Y.*

While the delegates to the Constitutional Convention of 1912 may not have been aware of the various constitutional provisions cited above, it is clear that they were aware of the provisions of some state constitutions. Vol. 2, Debates and Proceedings, at page 1431. Moreover, the language chosen for Section 16 of Article I was not without precedent. It was the prevailing concept of the majority of jurisdictions at that time. That concept was to abolish the defense of governmental immunity. But it was not to make the state amenable to suit without its express consent. In other words, it was not intended to be self-executing. Consent by the General Assembly would be manifested by the enactment of a statute or statutes providing in what courts and in what manner suits may be brought against the state.

Having examined the history of Section 16 of Article I, and similar provisions in other state constitutions, as construed by their supreme courts, this court is impelled to the same conclusion as that reached by the court in *Raudabaugh* v. *State, supra* (96 Ohio St. 513), and expressly approves the syllabus in that case. Likewise, because the decisions in the subsequent cases of *Palumbo* v. *Indus. Comm., supra* (140 Ohio St. 54), *State, ex rel. Williams,* v. *Glander, supra* (148 Ohio St. 188), and *Wolf* v. *Ohio State Univ. Hospital, supra* (170 Ohio St. 49), are predicated on *Raudabaugh*, they are also expressly approved.

Section 22 of Article II indicates a like conclusion,

---

*State Nat. Gas Corp.* (1961), 404 Pa. 269, 172 A. 2d 306, and *Meagher* v. *Commonwealth* (1970), 439 Pa. 532, 266 A. 2d 684.

[9] Section 27, Article III. "* * * in the absence of legislative enactment the state is immune from suit and liability for tort committed by an officer or employee in the performance of his duties." *Conway* v. *Humbert* (S. D. 1966), 145 N. W. 2d 524, 526.

[10] Section 8, Article I. "* * * a state exercising governmental functions cannot be made to respond in damages for tort and is not liable for the torts of its officers or agents in the discharge of their official duties, unless it has voluntarily assumed such liability and consented to be liable." *Chavez* v. *Laramie* (Wyo. 1964), 389 P. 2d 23, 25.

*i. e.,* that Section 16 of Article I was not intended to be self-executing. It provides:

"No money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law; * * *,"

When the provisions of Section 16 of Article I and Section 22 of Article II of the Ohio Constitution are considered *in pari materia,* it is clear that three distinct powers were delegated to the General Assembly: (1) the power to establish the courts where suits may be brought; (2) the power to provide the manner in which such suits may be brought; and (3) the power of control of the purse string, *i. e.,* the exclusive power to appropriate the money from the State Treasury to satisfy the claim. Were the opposite result to obtain, courts would render judgments which would be constitutionally uncollectible unless or until the General Assembly made an appropriation, or the plaintiff brought suit, in aid of execution, against the General Assembly. It was, in part, to safeguard against those problems that the delegates drafted Section 16 of Article I to empower the General Assembly to denominate in what courts and in what manner suits may be brought against the state.

Appellee syllogistically reasons that Section 5(B) of Article IV of the Ohio Constitution empowers this court to "prescribe rules governing practice and procedure in all courts of the state." Pursuant to such provision, this court has, through Civ. R. 4.2 provided that "service of process * * * shall be made * * * (10) upon this state * * * by serving the officer responsible for the administration of the department, office or institution, or by serving the Attorney General of this state," and through Civ. R. 1(a), has provided that "these rules prescribe the procedure to be followed in all courts of this state." Therefore, if Section 16 of Article I is interpreted as authorizing the General Assembly to enact laws providing for the courts and for the manner of bringing suits against the state, then he concludes and contends that the General Assembly has, in fact, given its consent to such suit because the General

Assembly has failed to disapprove the new Rules of Civil Procedure and has thereby provided for the courts and for the manner of bringing suits against the state.

As heretofore stated, Section 16 of Article I abolished the defense of governmental immunity and gave to the General Assembly the authority to determine in what courts and in what manner suits may be brought against the state. Its consent is manifest when it designates, by law, the courts and the manner in which such suits may be brought.

But the fundamental flaw in appellee's syllogism is that after Section 16 of Article I was adopted, the situation, in practical effect, was the same as before its adoption. Although the defense of governmental immunity was not available to the state, the defense of lack of consent by the General Assembly to such suit was available. Thus, an action based on tort was not properly maintainable against the state of Ohio unless it consented to such suit. That was the theory of the *Raudabaugh, Palumbo, Williams* and *Wolf, supra,* line of cases.

Understood in that light, the consitutional limitation on this court's power expressed in Section 5(B) of Article IV, that such "rules shall not abridge, enlarge, or modify any substantive right," clearly portrays the fallacy in appellee's reasoning. If the defense of lack of consent by the General Assembly to suits against the state was available as a right of or defense to the state *before* the adoption of the new Rules of Civil Procedure, and if such right or defense was a *substantive* right of the state, then it must remain available to the state *after* the adoption of the Rules of Civil Procedure, for this court cannot "abridge, enlarge, or modify any substantive right."

Obviously, this court could not constitutionally grant any consent to sue the state, and certainly such was not intended when this court drafted those rules. Thus, it follows that when the General Assembly approved the Rules of Civil Procedure it did not intend to grant its consent to such suits.

The word "substantive," as used in Section 5(B) of Article IV, is in contradistinction to the words "adjective" or "procedural" which pertain to the method of enforcing rights or obtaining redress. "Substantive" means that body of law which creates, defines and regulates the rights of the parties. (See Black's Law Dictionary.) The word substantive refers to common law, statutory and constitutionally recognized rights. Whether this lack of consent to suits against the state is viewed as a defense or as a right of the state, *i. e.*, the right not to be made a party defendant without its consent, it falls within that body of law traditionally denominated substantive. It both defines and regulates the rights of parties.

Admittedly, adjective and substantive law are not always mutually exclusive, but such a change in the public policy of this state ought not to be so lightly inferred from a general authorization to formulate "rules governing *practice* and *procedure* in all courts of this state." Accordingly, this court holds that the General Assembly has not manifested its consent to suits against the state of Ohio by its approval of the new Rules of Civil Procedure, specifically, Civ. R. 1(a) and 4.2(10).

The majority of the court below found the doctrine of governmental immunity violative of the Equal Protection Clause of the Fourteenth Amendment. It bottomed its decision upon a finding that the withholding of a remedy "from persons injured by state torts but not private ones or from some persons but not others injured by government in tortious, but different, phases of its activity" is capricious and represents no rational policy and thus "fatally offends the Constitution."

Section 16 of Article I is not, on its face, discriminatory, for it creates no classification. Without enabling legislation it is an absolute bar to suits against the state. Nor is the withholding of a legal remedy from persons injured by the state, while allowing a remedy for nongovernmental tortious activity, discriminatory governmental action. "The Constitution does not require things which

are different in fact or opinion to be treated in law as though they were the same." *Tigner* v. *Texas* (1940), 310 U. S. 141, 147. "* * * the Fourteenth Amendment does not deny to states the power to treat different classes of persons in different ways." *Reed* v. *Reed* (1971), U. S. , , 30 L. Ed. 2d 225, 229.

Assuming, *arguendo*, that there is in fact a classification, it is one which the General Assembly is empowered to make. To say that the state of Ohio is not entitled to a defense, *i. e.*, the right to plead lack of consent to such suit merely because a nongovernmental tortfeasor does not have the same right, is to preclude the combined legislative judgment that there may be substantive differences between the two types of conduct. "* * * we must be mindful not of abstract equivalents of conduct, but of conduct in the context of actuality. Differences that permit substantive differentiations also permit differentiations of remedy." *Tigner* v. *Texas, supra* (310 U. S. 141), page 149. Equal protection does not require that all inconsistencies be eradicated.

Moreover, the appellate court's observation that some injured plaintiffs may recover damages if the governmental activity is "excepted activity" is not a valid premise for a finding of a denial of Equal Protection of the Laws. Assuming that such observation refers to municipalities, or other political subdivisions, there are sufficient substantive differences between them and the state to allow for such different results.[11] Whether it is the nature of the conduct or activity undertaken, or the differences in its governmental and corporate existence, we need not now explore.[12]

---

[11]Because different considerations apply when the governmental body is a city, town, village, county, etc., the holding in the instant case may not be dispositive of the question of governmental immunity. Accordingly, we intimate no opinion on their amenability to suit.

[12]Appellant strenuously argues that *Palmer* v. *Ohio* (1918), 248 U. S. 32, 34, is dispositive of the equal protection argument. A reading of that case discloses that no equal protection argument was considered by the court. The phrase, "no federal right being involved" refers only to the statement that the right of an individual to sue the state "cannot be derived from the Constitution or laws of the United States."

Those substantive differences permit of different remedies and defenses. (See *County of Los Angeles* v. *Superior Court* [1965], 44 Cal. Rptr. 796, 402 P. 2d 868.)

For the above-stated reasons, this court holds that the doctrine of governmental immunity is not violative of the Equal Protection Clause of the Fourteenth Amendment.

We have examined appellee's other contentions and find them to be without merit.

Although the doctrine of governmental immunity was originally judicially created, it is not now subject to judicial re-examination. When the people of Ohio, in 1912, adopted Section 16 of Article I as part of the organic law of this state, they foreclosed to this or any other court the authority to examine the "soundness" or "justice" of the concept of governmental immunity. The people of Ohio placed that policy decision in the hands of the General Assembly, and the merits or demerits of granting or withholding consent are to be debated and determined by that body alone. It is not within the province of the judiciary to make that determination. Nor can we make that constitutional provision meaningless. The alternative remedy is by a constitutional amendment.

Because no legislative consent has been given by the General Assembly, the judgment of the Court of Appeals must be, and is, reversed.

*Judgment reversed.*

Schneider, Herbert, Corrigan, Stern and Leach, JJ., concur.

Brown, J., dissents.

Schneider, J., concurring. To answer further appellee's claim that the adoption of the Rules of Civil Procedure validates his action, I would hold that Section 5(B) of Article IV of the Ohio Constitution cannot be construed as meaning that the rule-making power includes the power to create courts or to confer jurisdiction upon existing courts.

To hold that it does would be to ignore specific lan-

guage to the contrary contained in Sections 1, 2(B), 3(B), 4(B), 15, 18 and 19 of Article IV.

Whether or not such powers are properly, although historically, delegable by a constitution to the legislative branch, they have never, in this country, been assigned to, or arrogated by, the judicial branch.

CORRIGAN, J., concurring. Although I concur in the judgment and the opinion of the majority, I am of the view that disposition of this cause requires additional comment.

A reading of the majority opinion reveals that this case forges no new principle of law but adheres to one consistently applied by this court in the past.

It is axiomatic that: "Decisions of a court of last resort are to be regarded as law and should be followed by inferior courts, whatever the view of the latter may be as to their correctness, until they have been reversed or overruled * * *." 21 Corpus Juris Secundum 343, Courts, Section 197.[13]

The foregoing rule has been recognized and followed in numerous cases by our courts. See the cases cited in 14 Ohio Jurisprudence 2d 653, Courts, Section 224. It should have been followed by the Court of Appeals here.

Instead, the majority of the Court of Appeals chose to ignore the well known precedents established by this court on the question of sovereign immunity and to flout the legal doctrine of *stare decisis et non quieta movere*—to stand by the precedents and not disturb established principles. That majority unsettled the stability of Ohio law on sovereign immunity with the widespread publicity given to their misleading, unwarranted and erroneous opinion and judgment in newspapers, magazines, law journals, legal periodicals, and in other news media.

---

[13]The author of the Court of Appeals majority opinion in this case was fully cognizant of this established principle of law as evidenced by his concurring opinion in *Fell* v. *Bureau of Motor Vehicles* (1972), 30 Ohio App. 2d 151, 164.

Attention should also be directed to Canon 20 of the Canons of Judicial Ethics adopted by the Supreme Court of Ohio on January 27, 1954, recorded in 176 Ohio St. lxxvii, and binding upon the judiciary of this state. That canon reads:

"Canon 20. *Influence of decisions upon the development of the law.*

"A judge should be mindful that his duty is the application of general law to particular instances, that ours is a government of laws and not of men, and that he violates his duty as a minister of justice under such a system if he seeks to do what he may personally consider substantial justice in a particular case *and disregards the general law as he knows it to be binding on him.* Such action may become a precedent unsettling accepted principles and may have detrimental consequences beyond the immediate controversy. He should administer his office with a due regard to the integrity of the system of the law itself, remembering that he is not a depositary of arbitrary power, but a judge under the sanction of law." (Emphasis added.)

BROWN, J., dissenting from paragraph four of the syllabus and from the judgment.

I concur with the majority that under the provisions of Section 16, Article I of the Ohio Constitution, as amended September 3, 1912, the state of Ohio is not subject to suits in tort without the consent of the General Assembly.

However, it is my belief that Section 16, Article I, on its face and as applied by the state (in the absence of such consent), unconstitutionally discriminates against the victims of state acts of negligence, in violation of the equal protection provision of the United States Constitution. It infringes upon one of the most fundamental progenitors of due process of law, through which all other legal rights may be enforced—access to the courts unhindered by the need for the expressed consent of the party-defendant.

The ability to seek redress in the courts is a fundamental right, guaranteed by the due process provision of the Fourteenth Amendment to the United States Constitution, and restrictions on such a right require "close scrutiny" by the judiciary.[14] A state classification denying this fundamental right to the victims of state negligence, in the absence of that state's expressed consent, draws a line that is repugnant to our traditional democratic concept of governmental responsibility to the public. Because of the importance of the right involved, and the suspect nature of a state's classification abrogating this right, the usual presumption of constitutionality is reversed. The state must justify the making of the fundamental legal rights of those injured by state acts of negligence contingent upon the good graces of the General Assembly. If a persuasive justification cannot be made for basing the legal rights of only the victims of state acts of negligence upon legislative prerogative, then the condition of legislative consent is properly characterized as "capricious," as bearing "no relation" to the right to legal recourse, and is thus unconstitutional.

Lack of equal protection of the laws can arise from the denial to one segment of society the rights to due process of law required by the Fourteenth Amendment which are enjoyed by the rest. Discrimination against such a legally "disenfranchised" group (the victims of state negligence), in derogation of as important a right as due pro-

---

[14]The right to access to the courts without the consent of government is as basic as these other fundamental rights recognized by the United States Supreme Court: education, *Brown* v. *Bd. of Edn.* (1954), 347 U. S. 483; marriage, *Loving* v. *Virginia* (1967), 388 U. S. 1; fairness in the criminal process, *Gardner* v. *California* (1969), 393 U. S. 367, *Griffin* v. *Illinois* (1956), 351 U. S. 12, *Anders* v. *California* (1967), 386 U. S. 738, *Douglas* v. *California* (1963), 372 U. S. 353; and procreation, *Skinner* v. *Oklahoma, ex rel. Williamson, supra* (316 U. S. 535).

Even the right of an illegitimate child to obtain wrongful-death damages arising from the death of his parent has been classified among *the basic civil rights we all enjoy. Levy* v. *Louisiana* (1968), 391 U. S. 68, 71.

cess of law by impeding open and equal access to the courts, is, in the absence of a showing of compelling justification, "invidious discrimination" which violates the equal protection clause.

The phrase "invidious discrimination," in its modern usage, first came from the case of *Skinner* v. *Oklahoma, ex rel. Williamson* (1942), 316 U. S. 535, 541, where the Supreme Court stated:

"* * * When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it selected a particular race or nationality for oppressive treatment."

Likewise, where the state commits intrinsically the same negligent act as would justify recovery if committed by a private entity, and the law lays an unequal hand on those who have "been the unfortunate victims of the state, * * * it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment."

A classification that discriminates with respect to a right of very great importance is not to be sustained merely because the classification has a rational basis; if the state fails to supply a *substantial justification*, its discrimination is invidious and unconstitutional. What is apparent from a reading of those United States Supreme Court cases where a state's classification was held to be unconstitutional was not, in each instance, that the legislative choices were wholly arbitrary, but rather, that they lacked sufficient justification, considering the importance of the interest which they harmed.[15] Whenever a state provision impringes upon the exercise of a federally guaranteed and constitutionally protected right, a showing of compelling state interest is required before such provision can be sus-

---

[15]See *Reynolds* v. *Sims* (1964), 377 U. S. 533; *Glona* v. *American Guarantee & Liability Ins. Co.* (1968), 391 U. S. 73; *King* v. *Smith* (1968), 392 U. S. 309, 334; *Levy* v. *Louisiana* (1968), 391 U. S. 68.

tained under a challenge of denial of equal protection of the laws.

In *Shapiro* v. *Thompson* (1969), 394 U. S. 618, the one-year residence requirement in a state's welfare laws was held invalid, and the court found, at page 638:

"We conclude therefore that appellants in these cases do not use and have no need to use the one-year requirement for the governmental purposes suggested. Thus, even under traditional equal protection tests a classification of welfare applicants according to whether they lived in a State for one year would seem irrational and unconstitutional. *But, of course, the traditional criteria do not apply in these cases. Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a* COMPELLING *state interest.* Under this standard, the waiting period clearly violates the Equal Protection Clause." (Emphasis supplied.)

Thus, while there might be a rational basis for such a classification, "a mere showing of a rational relationship between the waiting period and (certain) admittedly permissible state objectives" is not adequate "to justify the classification." (394 U. S. at 634.)

The majority of this court has asserted that "Section 16, Article I, is not, on its face, discriminatory for it creates no classification," because all persons are barred from their bringing suits against the state. However, as recognized in *Brown* v. *Board of Edn.* (1954), 347 U. S. 483, "separate but equal" does not comport with equal protection of the laws where a fundamental right is involved.

The first sentence of Section 16, Article I provides: "*All* courts shall be open and *every* person, for an injury done to him * * * shall have remedy by due course of law, and shall have justice administered *without denial.* * * *" (Emphasis supplied.) The 1912 amendment, coupled with the legislative failure to provide consent for suits against the state, withholds that legal remedy from persons injured by the state, and in so doing "separates" their legal

rights from those of the rest of society. The amendment read as a *whole,* and as applied by the state creates a subdivisional classification wherein a part of society is singled out and denied its "remedy by due course of law."[16]

The majority of this court also cites the following language from *Tigner* v. *Texas* (1940), 310 U. S. 141, 147, with which I wholeheartedly agree.

"* * * The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."

However, as opposed to the majority of this court, I believe that, in order to determine whether such difference does exist, we must focus upon the *underlying substantive conduct* involved, *and not the status* of the party-defendant, when a denial of due process is involved. If two people are walking down the street together, and one is negligently run down by a privately owned and operated truck, while the second is run down by a state owned and operated truck, the law—and common decency—can ill-afford to say that those identical accidents are not "things which are different in fact."

The United States Supreme Court has through numerous decisions elucidated the meaning of Equal Protection of the Laws in the Fourteenth Amendment to the United States Constitution: *Griffin* v. *Illinois* (1956), 351 U. S. 12; *Skinner* v. *Oklahoma, ex rel. Williamson, supra* (316 U. S. 535); *Takahashi* v. *Fish and Game Comm.* (1948), 334 U. S. 410; *Yick Wo* v. *Hopkins* (1886), 118 U. S. 356; *Reed* v. *Reed* (1971), 30 L. Ed. 2d 225; *Baker* v. *Carr* (1962), 369 U. S. 186; *Brown* v. *Board of Edn., supra* (347 U. S. 483); and *Douglas* v. *California* (1963), 372 U. S. 353.

In each instance where the court found a denial of equal protection, the state was found to have discriminated against the basic rights of persons who were, in fact, sub-

[16]The majority decision of this court also maintains this classification. As provided in paragraph one of the syllabus—only persons bringing on action in tort against the state need obtain the consent of the General Assembly.

stantively in no different a position than the remainder of society—and yet they were treated differently by the state. The victim of the state truck is both substantively and literally in no different a position than the victim of the private truck. Yet one, but not the other, is denied his day in court in Ohio.

The arguments offered by the state of Ohio have not satisfied the state's burden of showing "compelling reason" for this classification, which in the absence of consent deprives an entire group of victims the right to seek redress before an impartial tribunal of the law.[17]

Appellant recommends to this court that the "preservation of sovereign immunity is essential to the operation of modern state government." The rationale for this assertion is "the very complexity of today's government * * * viewed in terms of the incredible demands which modern society has thrust upon government."

However, it is the very *expansion* of governmental activities into the realm of heretofore private sectors of our society and economy which requires—rather than mitigates —the need for government to be increasingly financially responsible for governmental wrongs committed against private individuals. These private individuals are today's "emerging minority"—constituting a "disadvantaged" group denied total access to the courts in the face of the continuing absence of legislative consent. Traditionally, the courts have given close scrutiny to provisions that adversely affect the basic interests of other disadvantaged groups. As stated in *Hobson* v. *Hansen* (1967), 269 F. Supp. 401, 507:

"" * * * Judicial deference to these [legislative and ad-

---

[17]As provided at the present time by R. C. 127.11, persons having claims against the state of Ohio where no other form of remedy is available must present their cause to the Sundry Claims Board. The board only has power to approve claims of $1000 or less, there is no provision for trial by jury, nor appeal nor review of its decisions. The findings of the board serve only as a recommendation to the General Assembly, and the General Assembly may, and does on occasion, refuse to appropriate funds for claims approved by the board.

ministrative judgments] is predicated in the confidence courts have that they are just resolutions of conflicting interests. This confidence is often misplaced when the vital interest of the poor and racial minorities are involved. For these groups are not always assured a full and fair hearing through the ordinary political processes, not so much because of the chance of outright bias, but because of the abiding danger that the power structure—a term which need carry no disparaging or abusive overtones—may incline to pay little heed to even the deserving interests of a politically wasteless and invisible minority.''

The best means of determining whether or not sovereign immunity is essential to the operation of state government is simply to examine the experiences of the many states which have already abrogated governmental immunity (by either legislative act, constitutional provision or judicial decision). I submit that those states are today still viable governmental and social entities, are still able to provide the functions and services necessary in a modern society, and there is no reason to believe that the experience of Ohio would be to the contrary.

The statistical data cited in appellee's brief indicates that the fears of fiscal ruin brought by the abolition of sovereign immunity have not been justified.[18] See Note, 68 Harv. L. Rev. 506, 517.

After New York consented to having its liability deter-

---

[18]It should be noted that increased expense to the state is not in itself a "compelling reason" to justify the continued denial of equal protection of the laws. As stated in *Shapiro* v. *Thompson, supra* (394 U. S. 618), at page 633:

"We recognize that a state has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a state may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification."

mined in the same manner as a private citizen, the state experienced no intolerable burden on its economy. See MacDonald, The Administration of a Tort Liability Law in New York (1942), 9 Law and Contemporary Problems 262, 280. See, also, 7th Progress Report to the Legislature, California Senate Fact-Find in Committee on Judiciary (1963).[19]

Far from hindering the state in its vital activities, the removal of the continuing constitutional discrimination against persons seeking suit against the state of Ohio would instead deter state agencies from engaging in negligent and harmful activity. Governmental liability would carry with it the kind of precautions and responsibilities by state entities which ought to be observed in the interest of *all* the people of this state.

Because of appellant's failure to show a compelling state interest for maintaining this discriminatory treatment of its citizens, I would affirm the decision of the Court of Appeals.

---

[19]In that report relied upon by appellee it is noted that California, in the year 1962 after that state's decision in *Muskopf* v. *Corning Hospital Dist.* (1961), 359 P. 2d 457 (abridging governmental immunity in that state), but before the California Tort Claims Act became effective, insurance costs averaged between .099 percent to .269 percent of the annual budgets of that state's cities, school districts and counties For the same year, the average per capita cost in cities was 41 cents, for school districts, 65 cents per person, and for counties only 8 cents per person.