WILLIAMS, APPELLANT, *v.* CITY OF COLUMBUS, APPELLEE, ET AL.

(No. 72-421—Decided April 4, 1973.)

76

*Messrs. Topper, Alloway, Goodman, DeLeone & Duffey, Mr. John J. Duffey, Messrs. Tyack, Scott & Colley* and *Mr. Michael F. Colley,* for appellant.

*Mr. James J. Hughes, Jr.,* city attorney, *Mr. Robert A. Bell* and *Mr. Thomas A. Bustin,* for appellee.

CORRIGAN, J.   Appellant propounds three propositions of law, each relative to the issue of sovereign immunity. These propose that Section 16, Article I of the Ohio Constitution, as amended in 1912, is self-executing and authorizes suits against the state of Ohio and its political subdivisions brought by individuals injured by the negligence of its agents, servants and employees; that Section 5(B), Article IV of the Ohio Constitution, as adopted in 1968, requires the Ohio Supreme Court to establish procedures for bringing suits against the state, and that such procedures have been established by this court in the Ohio Rules of Civil Procedure; and that the doctrine of sovereign immunity violates the due process and equal protection

guarantees in the Ohio Constitution and in the United States Constitution.

Subsequent to certification of the instant case by the Court of Appeals for Franklin County, this court decided *Krause* v. *State* (1972), 31 Ohio St. 2d 132, reversing the judgment of the Court of Appeals for Cuyahoga County. In *Krause*, this court rejected the same propositions advanced by appellant in the instant case.

The judgment of the Court of Appeals herein, affirming the order of the Court of Common Pleas sustaining the city's demurrer and dismissing it as a defendant, was based upon the validity of the defense of sovereign immunity in a case wherein the municipality is sued for claimed negligence in the exercise of a governmental function. The Court of Appeals was correct.

In *Wooster* v. *Arbenz* (1927), 116 Ohio St. 281, 283, Chief Justice Marshall, speaking for the court, stated the Ohio doctrine of the tort liability of municipalities as follows:

"This court is for the present committed to the doctrine that there is no liability on the part of a municipality in actions for tort, if the function exercised by the municipality at the time of the injury to the plaintiff was a governmental function. The nonliability for governmental functions is placed upon the ground that the state is sovereign, that the sovereign cannot be sued without its consent, and that the municipality is the mere agent of the state and therefore cannot be sued unless the state gives its consent by legislation. * * *

"The court is equally committed to the doctrine that if the function being exercised is proprietary and in pursuit of private and corporate duties, for the particular benefit of the corporation and its inhabitants, as distinguished from those things in which the whole state has an interest, the city is liable."

The court, at page 284, set out the following test for distinguishing governmental and proprietary functions:

"* * * In performing those duties which are imposed

upon the state as obligations of sovereignty, such as protection from crime, or fires, or contagion, or preserving the peace and health of citizens and protecting their property, it is settled that the function is governmental, and if the municipality undertakes the performance of those functions, whether voluntarily or by legislative imposition, the municipality becomes an arm of sovereignty and a governmental agency and is entitled to that immunity from liability which is enjoyed by the state itself. If, on the other hand, there is no obligation on the part of the municipality to perform them, but it does in fact do so for the comfort and convenience of its citizens, for which the city is directly compensated by levying assessments upon property, or where it is indirectly benefited by growth and prosperity of the city and its inhabitants, and the city has an election whether to do or omit to do those acts, the function is private and proprietary."

Although the distinction between proprietary and governmental functions has been the subject of confusion and difficulty in Ohio (see Judge Gibson's concurring opinion in *Hack* v. *Salem* [1963], 174 Ohio St. 383, 391), this court has clearly stated, in paragraph one of the syllabus in *Bell* v. *Cincinnati* (1909), 80 Ohio St. 1, that the operation of a municipal workhouse is a governmental function. The decision in *Bell* was based in part upon the authority granted by the General Assembly to establish workhouses.

Section 3, Article XVIII of the Ohio Constitution, grants municipalities the authority to exercise all powers of local self-government including the authority "* * * to adopt and enforce * * * local police * * * regulations * * *." Section 7, Article XVIII of the Ohio Constitution, authorizes any municipality to "* * * frame and adopt or amend a charter for its government and may * * * exercise thereunder all powers of local self-government."

The General Assembly has also specifically authorized, in R. C. 715.16, that "any municipal corporation may * * * (A) Establish, erect, maintain, and regulate * * * workhouses * * *" and, pursuant to R. C. 715.58, that "the

legislative authority of a municipal corporation may make suitable regulations to conduct the prison labor * * *.''

The foregoing statutory and constitutional provisions manifestly indicate that the operation of a municipal workhouse is the authority of sovereignty which is specifically granted to municipalities as a power of self-government in the interest of the common good. It is clearly a governmental function.

The judgment of the Court of Appeals is, therefore, affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE and W. BROWN, JJ., concur.

GRAY, J., dissents.

GRAY, J., of the Fourth Appellate District, sitting for P. BROWN, J.

GRAY, J., dissenting. I am of the opinion that the defense of sovereign immunity is not a valid defense in this case.

Having the temerity to attack such a sacred doctrine as that of ''sovereign immunity'' will, no doubt, cast me in the role of a rogue in many quarters. In such a situation I find the philosophy of Sir Anthony Hope Hawkins appealing. He stated it as follows:

''For my part, if a man must needs be a knave, I would have him a debonair knave * * *. It makes your sin no worse, as I conceive, to do it a la mode and stylishly.'' The Prisoner of Zenda, pp. 97, 98.

The rule of municipal tort immunity is knee-deep in legal esoterica, *e. g.*, governmental function versus proprietary function; relationship of governor to governed. The dogma of the rule is so deeply ingrained in our case

law that I deem it necessary to consider some of the historical origins of the rule and some of the critical assaults which have been made upon it.

"* * * how it [sovereign immunity] was then infiltrated into the law controlling the liability of municipal corporations in the tort field is one of the amazing chapters of American common-law jurisprudence." Green, Freedom of Litigation, 38 Ill. L. Rev. 355, 356. "It seems, however, a prostitution of the concept of sovereign immunity of the state to extend its scope in this way, for no one could seriously contend that local governmental units possess sovereign powers themselves." 54 Harv. L. Rev. 438, 439.

It requires but a slight appreciation of the facts to realize that if the individual citizen is left to bear almost all the risk of a defective, negligent, perverse or erroneous administration of some of a municipal corporation's functions, an unjust burden will become graver and more frequent as this government's activities are expanded and become more diversified.

The court, in *Wooster* v. *Arbenz* (1927), 116 Ohio St. 281, 285, has defined proprietary functions as follows:

"If * * * there is no obligation on the part of the municipality to perform * * * [a given function] and the city has an election whether to do or omit to do those acts, the function is private and proprietary."

The defendant city had the election to farm the land or not to farm it. It had the election to harvest the corn by mechanical pickers, to harvest it by hand or not to harvest it at all. It could have hired an independent contractor to do the work. In fact, it had the option not to plant corn or any crop, or to plant another such as wheat, soy beans, grass, or to put the land in the soil bank where income could be derived therefrom without the planting of any crops.

This court, in *Sears* v. *Cincinnati* (1972), 31 Ohio St. 2d 157, in the first paragraph of the syllabus, said:

"The maintenance of a municipal hospital by a municipal corporation is not essential to the government of a

municipality and is not an exercise of an inherently governmental function." Hence, under the rule above announced, this activity was proprietary.

To paraphrase the above language: A farming operation upon municipally owned land is not essential to the government of a municipality and is not an exercise of an inherently governmental function.

We must therefore conclude that the plaintiff was not injured while defendant city was performing a governmental function.

Furthermore, if the distinction between governmental and proprietary functions is desired to be made then we could say that the operation of a workhouse could be classed as governmental, but I am not persuaded that the assignment of plaintiff to work as a member of a work detail from the Columbus Workhouse on farm land near the Columbus International Airport is a governmental function of the defendant city. There is no connection, actually, between the operation of the Columbus Workhouse and the operation of a farm on land adjacent to the airport. This land no doubt is owned and held by the defendant city to provide for possible future expansion of the airport.

I am convinced that there is a wide difference between the liability for tort on the part of the state and on the part of a municipality.

Defendants rely on *Palmer* v. *Ohio* (1918), 248 U. S. 32, to bolster their position. In that case the state was "the real party," or "the party on the record." In this case, the state is neither "the real party" nor "the party on the record."

The Supreme Court of the United States addressed itself to this question in *Hopkins* v. *Clemson Agricultural College* (1911), 221 U. S. 636, wherein it plainly made the distinction between a state and municipal corporation when it said:

"In *County of Lincoln* v. *Luning*, 133 U. S. 529, 530, the court said that: 'While the county is territorially a part of the state, yet politically it is also a corporation, created

by and with such powers as are given to it by the state. In this respect it is a part of the state only in that remote sense in which any city, town, or other municipal corporation may be said to be a party.' The court there held that the Eleventh Amendment was limited to those cases in *which the state is the real party, or party on the record, but that counties were corporations which might be sued. Dunn* v. *University of Oregon,* 9 Ore. 357, 362; *Herr* v. *Central Kentucky Lunatic Asylum,* 97 Ky. 463 * * *.
" " * * *

"Undoubtedly counties, cities, townships, and similar bodies politic often have a defense which relieves them from responsibility where a private corporation would be liable. *But they must at least make that defense. They cannot rely on freedom from accountability as could a state.*" (Emphasis supplied.)

In view of the above statement it is my opinion that it can be successfully urged that the constitutional rights of plaintiff have been violated in that the state of Ohio has denied plaintiff the equal protection of the laws.

*Krause* v. *State* (1972), 31 Ohio St. 2d 132, has been cited in the majority opinion as an authority for its holding. The case involved the death of one of the students at Kent State University in the recent disturbances at that university. I think that *Krause* can be distinguished by the statement contained in *Spencer* v. *General Hospital of Dist. of Columbia* (1969), 425 F. 2d 479, 489, wherein the court said:

"Almost every act of government involves injury to someone, and yet 'it is not a tort for government to govern.' " It is not the policy of a state to place limitations on the power and means of maintaining its own existence.

Whether to use the militia in a given situation involves a policy decision and discretionary judgment of the highest order. It involves the very basic decision as to whether in the judgment of the chief executive it was necessary to call out the militia to maintain law and order when it was apparent that civilian authorities could not control the situ-

ation. Such a decision cannot be subject to review by the judiciary. Otherwise one of the fundamental doctrines of our form of government would be destroyed, that of separation of powers.

There is no such impediment to the judiciary deciding the case now before us. Whether to use or not to use a corn picker at a special time and place is not a matter of such delicacy or difficulty as to cause it to rise to a policy-making level. It was a purely ministerial act.

The point is made that a *farming* decision and not a *governmental* policy judgment was involved. Thus the complaint here is of fault in *execution* of a kind which courts of the state of Ohio evaluate many times a year.

I do not think that we should continue to adhere to the rigid formula of "governmental" versus "proprietary" to signify the boundaries between what are regarded as characteristically public, as distinct from private, enterprises. It has been suggested that the elaborate categories be replaced by a single rule—that the existence and extent of the defendant city's duty to the plaintiff is to be determined in the context of all the circumstances of the action of which plaintiff complains.

Judge Bazelon, Chief Judge, U. S. Circuit Court of Appeals, District of Columbia Circuit, in a concurring opinion, said:

"I would decide cases against the sovereign in a like manner, *treating the degree of discretion available to Government officials in performance of their office and the public interest in protecting the exercise of that discretion as among the 'circumstances of the action'* to be considered." *Elgin* v. *District of Columbia* (1964), 337 F. 2d 152, 157. (Emphasis added.)

Although the defendant city had various options, no choice existed for the plaintiff. He was where he was, doing what he was required to do, under absolute compulsion. For the above reasons the defendant municipal corporation should not be protected by the doctrine of sovereign immunity.

84

The writer wishes to approach this problem on a broader scope than the narrow ground related above.

Section 7, Article VIII of the Constitution of 1802, states:

"That all courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by the due course of law, and right and justice administered, without denial or delay."

Section 16, Article I of the Constitution of 1851, contains the same provisions as above.

In 1912, the above language was amended by adding the following:

"Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

In *Krause* v. *State, supra* (31 Ohio St. 2d 132), at page 134, Chief Justice O'Neill, speaking for the court, said:

"The Constitutions of 1803 and 1851 were silent on the question of governmental immunity, but case law by this court clearly shows that it existed in Ohio. See *State* v. *Franklin Bank of Columbus* (1840), 10 Ohio 91; *Miers* v. *Zanesville and Maysville Turnpike Co.* (1842), 11 Ohio 273; and *Seely* v. *State* (1842), 11 Ohio 501, affirmed, 12 Ohio 496. Thus, the doctrine had a judicial origin."

The second paragraph of the syllabus in *Krause* is as follows:

"Section 16 of Article I of the Ohio Constitution, as amended September 3, 1912, abolished the defense of governmental immunity and empowered the General Assembly to decide in what courts and in what manner suits may be brought against the state."

The court, in *Krause*, said further that the provision for the method of suing the state had not been supplied by the General Assembly, and until that procedure had been established suits were not maintainable. It can be cogently argued that the General Assembly is waiting for the Supreme Court to make the first move to abolish its rule of sovereign immunity, as this court first promulgated the rule.

Section 16, Article I of the Constitution of 1851, states: "All courts *shall* be open, and every person * * * *shall* have remedy by due course of law, and *shall* have justice administered without denial or delay." (Emphasis supplied.)

The amendment to this section in 1912 states: "Suits *may* be brought against the state, in such courts and in such manner, as *may* be provided by law." (Emphasis supplied.)

In the first sentence of Section 16, Article I, the verb "shall" is used. In the second sentence the verb "may" is used. It is elementary in statutory construction that the verb "may" denotes permissiveness, whereas the verb "shall" denotes a mandatory situation. It must be remembered that the preamble to our Constitution states:

"*We the people of the state of Ohio*, grateful to Almighty God for our freedom, to secure its blessings and promote our common welfare, do establish this Constitution." (Emphasis supplied.)

The people have spoken. Ultimate sovereignty, as far as the state is concerned, rests in its people, and as long as the government established by them exists, that sovereignty remains with them, except insofar as they have expressly surrendered it to a higher sovereignty.

In *Prigg* v. *Commonwealth of Pennsylvania* (1842), 41 U. S. 539, the court, in its syllabus, said:

"* * * and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed.

"* * *

"* * * The fundamental principle applicable to all cases of this sort would seem to be, that where the end is required, the means are given; and where the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is intrusted.

"* * *

"Congress have, on various occasions, exercised powers which were necessary and proper, as means to carry

into effect rights expressly given, and duties expressly enjoined by the Constitution. The end being required, it has been deemed a just and necessary implication, that the means to accomplish it are given also; or, in other words, that the power flows as a necessary means to accomplish the ends.''

The plain, mandatory words of Section 16, Article I, require that every person, for an injury done him shall have justice administered without *denial* or *delay*. For 170 years this remedy has been denied and delayed.

The court in *Kintz* v. *Harriger* (1919), 99 Ohio St. 240, in the first two paragraphs of the syllabus said:

"1. The Constitution of Ohio, Bill of Rights, Section 16, provides, among other things, 'Every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law.'

"2. It is the primary duty of courts to sustain this declaration of right and remedy, wherever the same has been wrongfully invaded.''

I am of the opinion that the matter of sovereign immunity should be developed by the courts of Ohio case by case, and that it would not be salutary to eliminate the doctrine by one fell blow nor should it be embraced blindly.

I would reverse and remand this cause to the Common Pleas Court of Franklin County for trial upon the merits.