THACKER ET AL., APPELLANTS, *v.* BOARD OF TRUSTEES OF THE OHIO STATE UNIVERSITY ET AL., APPELLEES. (Two cases.)

[Cite as Thacker v. Bd. of Trustees of Ohio State Univ. (1973), 35 Ohio St. 2d 49.]

(Nos. 72-105 and 72-106—Decided June 27, 1973.)

50

*Santen, Santen & Hughes Co., L. P. A.,* and *Mr. William B. Singer,* for appellants.

*Messrs. Vorys, Sater, Seymour & Pease, Mr. Duke W. Thomas* and *Mr. Jacob E. Davis, II,* for appellees.

HERBERT, J. Subsequent to the certification of case No. 72-105 by the Court of Appeals because of the conflict with *Krause* v. *State, supra* (28 Ohio App. 2d 1), this court decided *Krause* v. *State* (1972), 31 Ohio St. 2d 132, and passed upon the issues presented. We will not reconsider those issues here. However, the remaining question which was raised in the Court of Appeals merits scrutiny: Whether the Ohio State University Hospitals may be sued in tort for the alleged negligent acts of hospital employees and agents in treating a patient at the hospital.

The first paragraph of the syllabus in *Krause* v. *State, supra* (31 Ohio St. 2d 132), succinctly states the law pertinent to this issue:

"The state of Ohio is not subject to *suits in tort* in the courts of this state without the consent of the General Assembly. (*Raudabaugh* v. *State,* 96 Ohio St. 513; *Palumbo* v. *Indus. Comm.,* 140 Ohio St. 54; *State, ex rel. Williams,* v. *Glander,* 148 Ohio St. 188; and *Wolf* v. *Ohio State Univ. Hospital,* 170 Ohio St. 49, approved and followed.)" (Emphasis added.)

Appellants orally argue that the Ohio State University Hospitals are not "the state," within the meaning of the *Krause* syllabus, and, therefore, that the hospital may be sued in tort if the operation thereof constitutes the performance by the state of a proprietary function. However, the fourth paragraph of the syllabus in *Wolf* declares:

"The Ohio State University and the Ohio State University Hospital are instrumentalities of the state of Ohio and as such *are not suable in tort* until the General Assembly of Ohio enacts a statute determining the courts and the

52

manner in which such suits may be brought against the state." (Emphasis added.)[1]

---

[1]This court has never wavered from the principle that if constitutionally oriented immunity from suit in tort exists with regard to the state, the benefit thereof inures with equal vigor to those entities classified as instrumentalities of the state. See *Brown* v. *Bd. of Edn.* (1969), 20 Ohio St. 2d 68, 253 N. E. 2d 767; *Wayman* v. *Bd. of Edn.* (1966), 5 Ohio St 2d 248, 249, 215 N. E. 2d 394; *Schaffer* v. *Bd. of Trustees* (1960), 171 Ohio St. 228, 229, 168 N. E. 2d 547; *Wolf* v. *Ohio State Univ. Hosp.* (1959), 170 Ohio St. 49, 53, 162 N. E. 2d 475; *State, ex rel. Williams,* v. *Glander* (1947), 148 Ohio St. 188, 74 N. E. 2d 82; *Farkas* v. *Fulton* (1936), 130 Ohio St. 390, 199 N. E. 850; *Neil* v. *Bd. of Trustees* (1876), 31 Ohio St. 15.

This view of the law obtains in the following other jurisdictions where a viable immunity theory exists pursuant to a constitutional provision:

*Alabama*: Section 14, Article I; *Hutchinson* v. *Bd. of Trustees of the Univ. of Alabama* (1971), 288 Ala. 20, 256 So. 3d 281.

*Arkansas*: Section 20, Article 5; *State Commr. of Labor* v. *Univ. of Arkansas Bd. of Trustees* (1966), 241 Ark. 399, 407 S. W. 2d 916.

*Connecticut*: Section 4, Article II; *Baker* v. *Ives* (1972), 162 Conn. 295, 294 A. 2d 290. But, see Sections 4-141 to 4-165, Conn. Gen. Stat.

*Delaware*: Section 9, Article I; *George & Lynch* v. *State* (1964), 197 A. 2d 734.

*Louisiana*: Section 26, Article 19 (immunity for specified state subdivisions), *Huckabay* v. *Netterville* (1972), 263 So. 2d 113; Section 35 Article 3 (the state and other instrumenalities thereof), *Weinstein Bronfin & Heller* v. *LeBlanc* (1966), 249 La. 936, 192 So. 2d 130.

*North Dakota*: Section 22, Article 1; *State, ex rel. Shafer,* v. *Lowe* (1926), 54 N. D. 637, 210 N. W. 501; *Heasley* v. *State* (N. D. 1962), 115 N. W. 2d 334.

*Pennsylvania*: Section 11, Article 1; *Duquesne Light Co.* v. *Dept. of Trans.* (1972), 6 Pa. Cmwlth. 364, 295 A. 2d 351; *Meagher* v. *Cmwlth.* (1970), 439 Pa. 532, 266 A. 2d 684.

*South Carolina*: Section 2, Article 17; *Sherbert* v. *School Dist. No. 85* (1933), 169 S. C. 191, 168 S. E. 391.

*Tennessee*: Section 17, Article 1; *Cox* v. *State* (1965), 217 Tenn. 644, 399 S. W. 2d 776; *Brewington* v. *Brewington* (1965), 215 Tenn. 475, 387 S. W. 2d 777.

*West Virginia*: Section 35, Article 6; *Hesse* v. *State Soil Conservation Comm.* (1969), 153 W. Va. 111, 168 S. E. 2d 293.

*Wisconsin*: Section 27, Article 4; *Appel* v. *Halverson* (1971), 50 Wis. 2d 230, 184 N. W. 2d 99.

*Wyoming*: Section 8, Article 1; *Chavez* v. *Laramie* (Wyo. 1964), 389 P. 2d 23.

Appellants seek to debilitate *Krause* and *Wolf* as precedents for the holdings below, contending that the issue of whether a governmental or proprietary function was being performed was not before the court in either case.

Such a position, however, overlooks one of the main points made in *Krause*. As set forth in the second paragraph of the syllabus in that case:

"Section 16 of Article I of the Ohio Constitution, as amended September 3, 1912, abolished the defense of gov-

The same view prevails in the jurisdictions which have retained common-law immunity for the state:

*Iowa: Graham* v. *Worthington* (1966), 259 Iowa 845, 146 N. W. 2d 626; *Iseminger* v. *Black Hawk Cty.* (1970), 175 N. W. 2d 374. But, see I. C. A., Section 25 A. 1 *et seq.*

*Maine: Nelson* v. *Maine Turnpike Auth.* (1961), 157 Me. 174, 178, 170 A. 2d 687; *Bale* v. *Ryder* (1972), 286 A. 2d 344. But, see 14 M. R. S. A. Section 157.

*Maryland: Dunkel* v. *Elkins* (1971), 325 F. Supp. 1235, 1247, n. 23; *University of Maryland* v. *Maas* (1938), 173 Md. 554, 197 A. 123.

*Massachusetts: Smith* v. *Commonwealth* (1964), 347 Mass. 453. 198 N. E. 2d 420.

*Mississippi: Lowndes County* v. *Mississippi State Highway Comm.* (1969), 220 So. 2d 349.

*Missouri: Smith* v. *Consolidated School Dist. No. 2* (1966), 408 S. W. 2d 50, 54; *Todd* v. *Curators of Univ. of Mo.* (1941), 347 Mo. 460. 147 S. W. 2d 1063.

*Montana: Longpre* v. *Joint School Dist.* (1968), 151 Mont. 345, 347, 443 P. 2d 1. But, see Section 75-7011, 2d Repl. Vol. 4 (Pt. 2), Montana Rev. Code.

*New Hampshire: Krzysztalowski* v. *Fortin* (1967), 108 N. H. 187, 230 A. 2d 750.

*North Carolina: Orange Cty.* v. *Heath* (1972), 14 N. C. App. 44, 187 S. E. 2d 345; *Brooks* v. *Univ. of N. Car.* (1968), 2 N. C. App. 157, 162 S. E. 2d 616; G. S. 143-291.

*Oklahoma: Donaldson* v. *Bd. of Regents* (1942), 190 Okla. 269, 122 P. 2d 139; *State, ex rel. Dept. of Highways,* v. *McKnight* (1972), 496 P. 2d 775.

*Oregon: Bacon* v. *Harris* (1960), 221 Ore. 553, 352 P. 2d 472; *Smith* v. *Cooper* (1970), 256 Ore. 485, 475 P. 2d 78. But, see O. R. S. 30.260-30.300.

*Utah: Cobia* v. *Roy City* (1961), 12 Utah 2d 375, 366 P. 2d 986.

See, also, 22 Cleve. St. L. R. 55, n. 2; Prosser, Law of Torts (4 Ed.), 976, Section 131; 74 Harv. L. Rev. 714; annotations, 160 A. L. R. 7, 86 A. L. R. 2d 489, and 33 A. L. R. 3d 703.

ernmental immunity and empowered the General Assembly
to decide in what courts and in what manner suits may be
brought against the state."

From that language, it should be readily apparent that
questions concerning the governmental or proprietary na-
ture of state activity were rendered irrelevant by *Krause*.
That case held that the state and its instrumentalities do
not have a defense of governmental immunity—that sover-
eign immunity exists in Ohio, insofar as suits against the
state are concerned, only because the constitutional require-
ment for legislative consent in the field has not yet been
satisfied. Since *Krause*, if not before,[2] any inquiry directed
to the nature of the function in which the state was engaged
at the time of an alleged wrong has become meaningless.

Since the General Assembly has not consented to suits
in tort against these appellees, the judgment of the Court
of Appeals must be affirmed.

*Judgment affirmed.*

O'NEILL, C. J., STERN and P. BROWN, JJ., concur.
CORRIGAN, CELEBREZZE and W. BROWN, JJ., dissent.

CORRIGAN, J., dissenting. The issue before this court is:
Whether the Ohio State University Hospitals may be held
accountable in tort for the negligent acts of hospital em-
ployees and agents in treating a patient, or whether the
doctrine of governmental immunity shields them from such
liability and justifies the trial court's grant of defendants'
motion to dismiss the compaint without that court first
making a determination as to whether the defendants, in

---

[2]Research fails to reveal any decision by this court in which state
immunity from suit turned upon a finding of the performance of a
"governmental function." While the concurring opinion of the late
Chief Justice Taft in *Wolf* could be construed to suggest that, at that
time, he was considering whether the governmental-proprietary func-
tion approach might have application in state cases, it should be noted
that the concurrence was not joined by other members of the court,
that Chief Justice Taft concurred in the syllabus in the case and that
he never repeated or developed the theory thereafter.

operating the Ohio State University Hospitals, were exercising a governmental function or a proprietary function.

The shield of immunity protected charitable hospitals from liability in tort prior to this court's decision in *Avellone* v. *St. John's Hospital* (1956), 165 Ohio St. 467, wherein it was held:

"A corporation not for profit, which has as its purpose the maintenance and operation of a hospital, is, under the doctrine of *respondeat superior*, liable for the torts of its servants."

The defense of governmental immunity was also available to municipal hospitals operated not as a proprietary but as a governmental function (*Hyde* v. *Lakewood* [1965], 2 Ohio St. 2d 155), until this court's decision in *Sears* v. *Cincinnati* (1972), 31 Ohio St. 2d 157. The syllabus in *Sears* reads:

"1. The maintenance of a municipal hospital by a municipal corporation is not essential to the government of a municipality and is not an exercise of an inherently governmental function.

"2. In an action for damages alleged to be caused by the negligence of an employee of a municipal hospital, the defense of governmental immunity is not available to the municipality which owns the hospital.

"3. Under the doctrine of *respondeat superior* a municipal corporation is liable to a party injured by the negligence of an employee of a hospital owned by the municipality."

In the opinion in *Sears*, at page 160, the following comment is found concerning the liability of hospitals operated by an instrumentality of the state: "The rule governing those hospitals, as expressed in paragraph four of the syllabus in *Wolf* v. *Ohio State University Hospital* (1959), 170 Ohio St. 49 * * * is that such hospitals '* * * are not suable in tort until the General Assembly * * * enacts a statute determining the courts and the manner in which such suits may be brought against the state.' "

The foregoing cases reflect the status of existing Ohio law in respect to immunity from liability of hospitals to

tortiously injured patients, *i. e.*, the immunity doctrine has been completely abolished as to hospitals operated by charitable corporations and as to those operated by municipalities. The question presently before the court is whether the immunity doctrine is applicable to a hospital operated by an instrumentality of the state in an action in tort wherein it is claimed that such hospital is not operated as a governmental but as a proprietary function.

Resolution of the issue presented requires re-examination of the *Wolf* case, which involved, as a defendant, the same University Hospital. A reading of *Wolf* discloses that its holding that the hospital was not liable in tort was based upon two considerations: (1) That the provision of Section 16, Article I of the Constitution of Ohio, providing that suits may be brought against the state in such courts and in such manner as may be provided by law, is not self-executing; and (2) that hospitals operated by instrumentalities of the state as governmental functions are immune from tort liability. This latter consideration is evidenced by the quotation in the court's opinion, at page 53, from 25 A. L. R. 2d 210, that " 'as a general proposition, a governmental unit or agency is immune from liability for torts committed in connection with operating a hospital when it is operated in the performance of a governmental function.' "

That the court in *Wolf* did not consider the question presented in this appeal, *i. e.*, whether the hospital could be liable in tort for negligence arising out of a proprietary function, is established by the concurring opinion of Taft, J., later C. J., wherein he stated:

"In my opinion, there are no allegations in the petition that would support a conclusion that the trustees of Ohio State University, in operating this hospital, were engaged in the performance of other than a governmental function. See 25 A. L. R. 2d, 203, 228 *et seq.* In the absence of specific statutory provision therefor, a public body, such as these trustees, is not liable in tort for negligence in the performance of a governmental function. *Whether it is suable or liable in tort for negligence in the performance*

*of a proprietary function is a question not before us for determination in this case."* (Emphasis added.)

Thus, it is only that portion of the holding in *Wolf* relating to the nonsuability of the state under Section 16 of Article I of the Ohio Constitution which, in the absence of statutory consent, may be relied upon as authority to foreclose recovery by plaintiffs in the present cause. The absence of such legislation has been held to bar actions against the state, both prior to and after the decision in *Wolf*. The cases so holding were reviewed in this court's most recent pronouncement on the subject in *Krause, supra* (31 Ohio St. 2d 132). The syllabus in *Krause* reads:

"1. The state of Ohio is not subject to suits in tort in the courts of this state without the consent of the General Assembly. (*Raudabaugh* v. *State,* 96 Ohio St. 513; *Palumbo* v. *Indus. Comm.,* 140 Ohio St. 54; *State, ex rel. Williams,* v. *Glander,* 148 Ohio St. 188; and *Wolf* v. *Ohio State Univ. Hospital,* 170 Ohio St. 49, approved and followed.)

"2. Section 16 of Article I of the Ohio Constitution, as amended September 3, 1912, abolished the defense of governmental immunity and empowered the General Assembly to decide in what courts and in what manner suits may be brought against the state.

"3. Section 16 of Article I of the Ohio Constitution, as amended September 3, 1912, which provides that '* * * Suits may be brought against the state in such courts and in such manner, as may be provided by law,' is not self-executing, and statutory consent is a prerequisite to such suit. (*Raudabaugh, Palumbo, Williams* and *Wolf, supra,* approved and followed.)

"4. Section 16 of Article I of the Ohio Constitution does not offend the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

"5. The rule-making authority of the Supreme Court of Ohio is limited under Section 5(B) of Article IV of the Ohio Constitution to the formulation of rules governing practice and procedure in all the courts of this state, and by such rules this court may not abridge, enlarge or modify any substantive right."

In the course of the opinion in *Krause,* the concept of Section 16, Article I, was described, at page 142, as follows:

"* * * That concept was to abolish the defense of governmental immunity. But it was not to make the state amenable to suit without its express consent. In other words, it was not intended to be self-executing. Consent by the General Assembly would be manifested by the enactment of a statute or statutes providing in what courts and in what manner suits may be brought against the state.

"Having examined the history of Section 16 of Article I, and similar provisions in other state constitutions, as construed by their supreme courts, this court is impelled to the same conclusion as that reached by the court in *Raudabaugh* v. *State, supra* (96 Ohio St. 513), and expressly approves the syllabus in that case. Likewise, because the decisions in the subsequent cases of *Palumbo* v. *Indus. Comm., supra* (140 Ohio St. 54), *State, ex rel. Williams,* v. *Glander, supra* (148 Ohio St. 188), and *Wolf* v. *Ohio State Univ. Hospital, supra* (170 Ohio St. 49), are predicated on *Raudabaugh,* they are also expressly approved."

It is evident at this point that *Krause* and the cases cited therein might be construed by some as barring plaintiffs' action here. See, also, *Schaffer* v. *Bd. of Trustees of Franklin County Veterans Memorial, supra* (171 Ohio St. 228). In *Krause,* however, as in *Wolf,* it was not necessary for the court to determine whether the state could be liable in tort for negligence committed in the exercise of a proprietary function. Each of those cases was decided upon the facts in the particular case.

In *Wolf,* the issue of whether a governmental function or a proprietary function was being exercised was not before the court. In *Krause,* it was clearly a governmental function which was involved. It is unnecessary to overrule, modify or distinguish the various paragraphs of the syllabi in *Wolf* and *Krause* because, as this court pointed out in paragraph one of the syllabus in *Williamson Heater Co.* v. *Radich* (1934), 128 Ohio St. 124:

"The syllabus of a decision of the Supreme Court of Ohio states the law of Ohio, but such pronouncement must be interpreted with reference to the facts upon which it was predicated and the questions presented to and considered by the court."

Prior to the decision in *Sears* v. *Cincinnati, supra* (31 Ohio St. 2d 157), overruling *Hyde* v. *Lakewood, supra* (2 Ohio St. 2d 155), liability in tort of municipal hospitals depended upon whether their functions were proprietary or governmental in nature. The rule was expressed in the syllabus of *Hyde,* as follows:

"1. Unless there is a statute removing immunity, a governmental unit or agency may escape liability for the commission of a tort upon a showing that a governmental function was being performed at the time the tort occurred.

"2. Whether the performance of various activities by a municipality is governmental or proprietary frequently depends on the peculiar facts of the particular case. In one instance a municipally owned hospital may be found to be carrying on a governmental function in the manner of its operation, whereas in another instance a finding may be made that a municipally owned hospital is being operated in a proprietary capacity."

That the state, as well as other governmental units, engages in activities in a proprietary capacity was recognized in *Cleveland Terminal & Valley Rd. Co.* v. *State, ex rel.* (1912), 85 Ohio St. 251; *Fidelity & Cas. Co.* v. *Union Savings Bank Co.* (1928), 119 Ohio St. 124; and *Sullivan* v. *State, ex rel. O'Connor* (1932), 125 Ohio St. 387. In fact, it was noted in the *Cleveland Terminal* case, at page 295, that "* * * when it acts in that capacity it is bound by the same rules as those which it applies to its citizens."

In *Carroll* v. *Kittle* (1969), 203 Kan. 841, 457 P. 2d 21, the Supreme Court of Kansas held the Board of Regents of the state of Kansas liable for personal injuries sustained by a patient while hospitalized in the University of Kansas Medical Center. In striking down the defense of sovereign immunity the court said, at page 850: "If the

government is to enter into businesses ordinarily reserved to the field of private enterprise, it should be held to the same responsibilities and liabilities.''

Prior to its decision in *Carroll,* the Kansas Supreme Court had held that ''a county is not liable for damages for negligence in any capacity unless such liability is expressly imposed by statute * * *''; that ''we have not been consistent in applying the rule to governmental agencies''; and that ''a city is liable for its negligent acts when acting in a proprietary capacity, particularly in hospital cases.'' (203 Kan., at page 847.)

The Supreme Court of California, in *Muskopf* v. *Corning Hospital Dist.* (1961), 55 Cal. 2d 211, 359 P. 2d 457, was presented with the question whether to apply the doctrine of governmental immunity to a hospital operated by a county. Observing, at page 214, that ''the state, like a municipality, can act in a proprietary capacity,'' the court proceeded to hold the governmentally operated hospital responsible, concluding that ''the rule of governmental immunity from tort liability must be discarded as mistaken and unjust.'' The California Supreme Court reached this conclusion even though Section 6 of Article XX of the California Constitution, stating that ''suits may be brought against the state in such manner and in such courts as shall be directed by law,'' was held to provide, at page 218, ''merely for a legislative consent to suit'' and therefore, as noted in *Krause, supra,* at page 139, ''was not self-executing.''

*Perkins* v. *State* (1969), 252 Ind. 549, 251 N. E. 2d 30, involved an action against the state of Indiana for damages to plaintiffs who became ill from contaminated water at a park owned and operated by the state. The defense of sovereign immunity was raised, the state contending that it was immune against suit unless it had consented thereto.

Section 24, Article 4 of the Indiana Constitution, provides: ''Provision may be made, by general law, for bringing suit against the state * * *.'' Interpreting this section, the court said, at page 551: ''As we read this section it occurs to us that the framers of the Constitution assumed

that at common law the state was immune from suit and authorized the Legislature to modify such liability to the extent it may see fit * * *. We are dealing here not with a constitutional prohibition, but rather with a principle of common law which has its roots in the ancient common law of England which held 'The King can do no wrong' and hence could not be sued in any court of law.''

The Indiana court, after reviewing its earlier holdings eliminating the immunity of charitable institutions and its holdings that municipalities were liable for proprietary functions, stated, at pages 556 and 557:

"If the cities, towns and lesser agencies of the state are liable under a principle of law, consistently then the state * * * should be liable for its acts under like circumstances.

‘‘* * *

"There may be some logical reason why a government should not be liable for its governmental actions and functions. We do not have that question before us and need not at this time give it further consideration, since the facts in this case show that the injurious act complained of in this case arose out of the proprietary function of the state of Indiana, namely, the furnishing of housing facilities in a state park. * * * It was a commercial project, supposedly operated in a business-like fashion. * * * It seems to us to be consistent in this principle of law and its application in this jurisdiction that if certain municipalites and the county governments are liable to the extent of the operation of proprietary functions, then there is no reason why the state as a principal should not likewise be liable for its proprietary function. It is of little concern to the injured party whether the injury was caused by a city, county or state. We, feel to be consistent, the common law principle should be applicable to all governmental units alike.''

In *Sears, supra* (31 Ohio St. 2d 157, 161), reasoning similar to that found in *Perkins* v. *State, supra* (252 Ind. 549), was employed by this court as follows:

"This court concludes that where a municipality owns

a hospital, thereby providing a service not essential to municipal government, there is no basis in logic for granting the municipality governmental immunity as to that hospital. In fact, logic dictates that a municipality owning a hospital should be treated in the same manner as was the charitable corporation in *Avellone, supra,* and should be liable in tort for injuries sustained by its hospital patients due to the negligence of its employes or agents."

Analysis of the foregoing cases and the reasoning expressed therein leads to the conclusion that the state, in the operation of a hospital in a proprietary capacity, "is bound by the same rules as those which it applies to its citizens." (*Cleveland Terminal & Valley Rd. Co.* v. *State, ex rel., supra* [85 Ohio St. 251, 295]), and should be liable in tort in the same manner as are charitable corporations and municipalities which operate hospitals. A further conclusion to be drawn is that, where a tort action is brought against the state for a wrong committed by its employees or agents in the performance of a proprietary function, such an action is not within the purview of the provisions of Section 16, Article I of the Ohio Constitution, and can be maintained without the consent of the General Assembly.

I adopt both of the preceding conclusions for my conclusion in this cause upon the basis, expressed in *Perkins* v. *State, supra* (252 Ind. 549), that "we are dealing here not with a constitutional prohibition, but rather with a principle of common law * * *."

It is recognized that this is a departure from our prior holding that the state is " * * * not suable in tort until the General Assembly * * * enacts a statute determining the courts and the manner in which such suits may be brought against the state." *Wolf* v. *Ohio State University Hospital, supra* (170 Ohio St. 49). Therefore, the cases cited therein, wherein tort actions were held not to be maintainable against the state because the General Assembly had not enacted statutes consenting to suit, and the actions were based upon torts committed by state employees or agents in the discharge of proprietary functions, should be dis-

approved. The ambit of that decision, of course, does not extend to cases where liability of the state may be disclaimed for the reason that the state's action involves a governmental function. See, *e. g.*, *Williams* v. *Columbus* (1973), 33 Ohio St. 2d 75.

It is recognized, also, as pointed out in *Krause*, at page 143, that: "When the provisions of Section 16 of Article I and Section 22 of Article II of the Ohio Constitution are considered *in pari materia*, it is clear that three distinct powers were delegated to the General Assembly: (1) the power to establish the courts where suits may be brought; (2) the power to provide the manner in which such suits may be brought; and (3) the power of control of the purse string, *i. e.*, the exclusive power to appropriate the money from the state treasury to satisfy the claim."

Our position herein, that lack of statutory consent for suit does not foreclose the present action, necessitates discussion of item three above, *i. e.*, legislative power over appropriations for satisfaction of judgments in cases where the state is adjudged liable in cases involving proprietary functions. This, of course, is fundamentally a problem for legislative solution. Parenthetically, we observe, that, since 1957, R. C. 9.83 has provided for the state and its political subdivisions to procure insurance insuring its officers and employees against liability occasioned by operation of a motor vehicle being used in the course of the business of the state.

On the subject of insurance to defray liability expenses for charitable hospitals, Matthias, Acting C. J., in *Avellone, supra* (165 Ohio St. 467), stated, at pages 474 and 475:

"The policy that the funds of a nonprofit hospital should not be diverted for any purpose other than the purpose for which it was organized, causing a depletion of the hospital's resources, and thus immunizing them from liability no longer has any foundation in our present day economy. Under present day conditions a hospital may fully protect its funds by the use of liability insurance, and, since such funds may be used to recompense those who are

injured through the negligent selection of servants and strangers, there is no reason why such funds may not be used in the purchasing of insurance which will protect not only the hospital and its funds but also any person injured through its negligence or the negligence of its servants.

"In mentioning insurance we call attention to the fact that the present discussion does *not concern the imposition of liability where none theretofore existed.* It concerns, rather, the public policy which has heretofore held institutions such as the defendant immune as to beneficiaries, under a liability which is pre-existent under the ordinary rule of *respondeat superior.* We emphatically state that we are not imposing a liability heretofore nonexistent merely because it may be indemnified by insurance.

"What we do find with regard to this aspect is that the availability of liability insurance and the existing power to purchase it with hospital funds, coupled with the increased base of remuneration for services rendered and the efficient businesslike management of modern hospitals, certainly tend to negate the argument that to hold the hospital amenable, under the doctrine of *respondeat superior,* to damages for injuries to patients caused by the negligence of its servants would be such a detriment as to defeat the charitable purpose for which it was organized and incorporated."

Similarly, here, imposition of liability upon the state for torts committed by its agents or employees engaged in the performance of proprietary functions should not impede appreciably the operation of the state and its agencies.

In a concurring opinion in *Hack* v. *Salem* (1963), 174 Ohio St. 383, 397, which involved immunity of a municipality, Judge Gibson stated: "To raise the question of whether the municipality or the injured individual is better able to bear the cost is to answer it. The municipality, which is able to spread the burden of the cost of an injury among its taxpaying residents, is in a much better position, in the vast majority of cases, than the injured individual, who

must bear such loss from his own resources." This reasoning is readily applicable to the state and is a cogent argument for making the state answerable in tort for wrongs visited by it upon its citizenry.

Adoption of the principle that the state is liable for torts committed by its agents and employees engaged in proprietary functions raises no greater problems, in determining what is proprietary and what is governmental, than this court has been confronted with in the past in cases where such rule has long prevailed in suits brought against municipalities. As to hospitals specifically, the factors to be considered were discussed in detail in *Hyde* v. *Lakewood, supra* (2 Ohio St. 2d 155).

It might be said that disapproval of prior cases which have permitted the defense of governmental immunity in cases where there was no statutory consent for suit against the state, and where proprietary functions may have been established, violates the principle of *stare decisis.*

The decisions in *Avellone, supra,* and *Sears, supra,* however, illustrate that the principle of *stare decisis* on occasion must yield to allow for the evolutionary development of the law. The conclusion I reach here is no more than an extension of the rationale of those cases.

The posture of the present cause is that the trial court, following the law as previously announced by this court, sustained defendants' motion to dismiss. Thus, no determination was made as to whether the operation of defendant hospitals was a governmental or proprietary function. In accordance with our position that the state is answerable in tort for the negligent acts of its agents or employees committed while carrying on proprietary functions, the defendants may be liable if it is found that the operation of the hospitals is a proprietary function. Such a determination should be made in the trial court.

Therefore, the judgment of the Court of Appeals should be reversed and the cause remanded to the Court of Common Pleas for further proceedings not inconsistent with the views expressed herein.

66

WILLIAM B. BROWN, J., dissenting. Although I concur in the dissenting opinion of Justice Corrigan, I believe the suit should be allowed because the defense of governmental immunity is obsolete.

In this case, a hospital is claiming governmental immunity in a suit brought by an injured patient because it is part of the Ohio State University which is an agency of the government of the state of Ohio.

Immunity in this state has brought about grave injustices and discriminations. A person who has received negligent treatment in a city-owned hospital may sue for recovery, *Sears* v. *Cincinnati* (1972), 31 Ohio St. 2d 157; but, in this case, a person injured in a hospital that is run by a state university cannot sue—so the majority here holds. A tenant injured when the handrail on a stairway collapsed is denied recovery because the building is owned by the Board of Trustees of Franklin County Veterans Memorial, *Schaffer* v. *Board of Trustees* (1960), 171 Ohio St. 228; whereas in *Dean* v. *Board of Trustees* (1940), 65 Ohio App. 362, recovery was allowed to a woman who fell down the stairs in a building which was managed by the Board of Trustees of the Soldiers and Sailors Memorial Building. For a list of the inconsistencies in this area of law see the concurring opinion of Judge Gibson in *Hack* v. *Salem* (1963), 174 Ohio St. 383, 391.

Even though the courts that have abrogated governmental immunity have catalogued the evils of the rule,[3] the

[3]*Stone* v. *Arizona Highway Comm.* (1963), 93 Ariz. 384, 381 P. 2d 107; *Muskopf* v. *Corning Hosp. Dist.* (1961), 55 Cal. 2d 211, 359 P. 2d 457; *Evans* v. *Board of County Commrs.* (Colo. 1971), 482 P. 2d 968; *Hargrove* v. *Cocoa Beach* (Fla. 1957), 96 So. 2d 130; *Smith* v. *Idaho* (1970), 93 Idaho 795, 473 P. 2d 937; *Molitor* v. *Kaneland Community Unit Dist.* (1959), 18 Ill. 2d 11, 163 N. E. 2d 89; *Carroll* v. *Kittle* (1969), 203 Kan. 841, 457 P. 2d 21; *Haney* v. *Lexington* (Ky. App. 1964), 386 S. W. 2d 738; *Williams* v. *Detroit* (1961), 364 Mich. 231, 111 N. W. 2d 1; *Spanel* v. *Mounds View School Dist.* (1962), 264 Minn. 279, 118 N. W. 2d 795; *Rice* v. *Clark County* (1963), 79 Nev. 253, 382 P. 2d 605; *Willis* v. *Department of Conserv. & Econ. Dev.* (1970), 55 N. J. 534, 264 A. 2d 34; *Becker* v. *Beaudoin* (1970), 106 R. I. 562, 261 A. 2d 896; *Kelso* v. *Tacoma* (1964), 63 Wash. 2d 913, 390 P. 2d 2; *Holytz* v. *Milwaukee* (1962), 17 Wis. 2d 26, 115 N. W. 2d 618.

courts that have adhered to the rule cite few reasons for that position, other than the longevity of the doctrine and its firmly established position. The reason adduced most frequently to support it is that:

"* * * if there is to be a departure from the rule [of governmental immunity] the policy should be declared and the extent of liability fixed by the Legislature." *Conway* v. *Hambert* (1966), 82 S. D. 317, 323, 145 N. W. 2d 524. This type of argument begs the question of the desirability of the doctrine and relegates the whole problem to a discussion of who should change the doctrine.

Despite all the negative aspects and the repeated criticisms of the doctrine of governmental immunity, the majority still wants to retain the essence of the doctrine.

In Ohio, the doctrine has been judicially created and, as such, it can be abrogated by the judiciary. This court, in *Krause* v. *State* (1972), 31 Ohio St. 2d 132, concluded that governmental immunity in Ohio was judicially created, stating, at page 134: "Thus, the doctrine [of governmental immunity] had a judicial origin." Justice Traynor, in *Muskopf* v. *Corning Hospital Dist.* (1961), 55 Cal. 2d 211, 218, 359 P. 2d 457, also agrees that "the doctrine of governmental immunity was originally court made."

This doctrine appeared in Ohio law around 1840 in *State* v. *Franklin Bank of Columbus* (1840), 10 Ohio 91, and in *Miers* v. *Zanesville and Marysville Turnpike Co.* (1842), 11 Ohio 273, 274, wherein the court said:

"To so much of the bill as assumes to compel the state to pay arrearages of its subscription, it is plain that no answer need be made; it is enough to say the state is not, in fact, a party, and is not capable of being made a party defendant."[4]

In *Miers*, Chief Justice Lane cited no constitutional provision or legislative enactment providing for the immunity. Therefore the common law of Ohio afforded the basis. The common law used by the courts in Ohio is not a

---

[4]The common-law doctrine was extended to encompass also local government units in *Dayton* v. *Pease* (1854), 4 Ohio St. 80.

copy of the English common law as it is in many states;[5] for even though the English common law was introduced for adoption in the state, this provision was repealed in 1806.[6]

The relationship between the Ohio common law and the English common law was best explained by Judge Thurman in *Bloom* v. *Richards* (1853), 2 Ohio St. 387, 390, as follows:

"* * * The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit of our federal and state constitutions and statutes, has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio. But wherever it has been found wanting in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, to wholly depart from it."

The English concept of sovereign immunity, which applied to the King or the Crown, was not "suitable to the condition and business of our people." So when the essence of this doctrine was incorporated into Ohio law, it was modified "to suit our circumstances."

Some people object that this doctrine could not be incorporated into the common law of Ohio because the English sovereign was repudiated by the revolution; that sovereignty could not reside in a deposed king! There is dispute as to exactly where this "sovereignty" resided after the American Revolution, but suffice it to say that some considered "sovereignty" to reside in the individual states and others "sovereignty" in the federal government. See *Chisholm* v. *Georgia* (1793), 2 U. S. 419.

Various justifications were advanced for sovereign immunity when the doctrine was first being employed in American courts. In *Russell* v. *Men of Devon* (1788), 100 Eng. Rep. 359, 362, the immunity was supported because (1) since

---

[5]For instance, Georgia adopted the common law of England by an Act of the General Assembly, approved on February 25, 1784 (Prince's 1837 Digest, p. 570; see, also, Cobb's 1851 Digest, p. 720).

[6]It was introduced in the Ordinance of 1787; it was repealed on January 2, 1806 (4 Ohio Laws 38).

the group was unincorporated, there was no fund out of which the judgment could be paid, and (2) "it is better that an individual should sustain an injury than that the public should suffer inconvenience.'" The Massachusetts Supreme Court first imported this rule into our country in *Mower* v. *Inhabitants of Leicester* (1812), 9 Mass. 247, even though the town was incorporated, could sue and be sued, and had a fund from which judgment could be satisfied.

In *State, ex rel. Parrott,* v. *Bd. of Public Works* (1881), 36 Ohio St. 409, 415, this court upheld state immunity saying:

"* * * Not because a citizen may not have a just claim against the state, or may not suffer injury at the hands of the state; but because it must be assumed that the state will ever be ready and willing to act justly toward its citizens in the absence of statutes or the intervention of courts."

The first two reasons merit no reply, since they are now obviously inapplicable. As Justice Traynor said in *Muskopf, supra* (55 Cal. 2d 211) at 216: "If the reasons for *Russell* v. *Men of Devon* and the rule of county or local district immunity ever had any substance, they have none today." Furthermore, the widespread availability and use of insurance or other modern funding methods render an argument based on economics invalid. If the state were to "ever be ready and willing to act justly toward its citizens," as this court claimed in *State, ex rel. Parrott,* v. *Bd. of Public Works, supra,* at 415, there would not be all the support for abrogation of governmental immunity. Anyone who has tried to collect a large sum from the Sundry Claims Board or through a private bill in the General Assembly knows only too well the falsity of this statement.[8]

Even though the reasons behind a doctrine have van-

---

[7]It is a sad commentary on our concept of justice if we still believe "that an individual should sustain an injury" rather than the state be inconvenienced!

[8]See the Note: Claims against the State of Ohio: The Need for Reform, 36 U. of Cin. L. R. 239 (1967).

ished and even though the continuation of it renders an injustice to all people wronged by the state or its agents, it is suggested that the rule be retained because of the principle of *stare decisis*.

Greater justification is needed for a rule of law than that it has been part of the common law for a few hundred years. As Justice Holmes said:

"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Oliver Wendell Holmes, Collected Legal Papers (1920), p. 187.

As to the fundamental nature and the importance of *stare decisis*, there is no doubt. It lies at the heart of the common law. By this rule, our society has preserved the best of the wisdom and the morality of past ages. Wisdom and morality, however, are not immutable universals of the scholastic philosophers; they are to be modified by each new generation.

When, however, a rule of law is judge-made, and the reasons for its use have vanished, the court should not perpetuate it until petrification. A rule that has outlived its usefulness should be changed. Such an approach to *stare decisis* was urged by Justice Cardozo in his outstanding book, The Nature of the Judicial Process, pp. 150-152:

"But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have

determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in *Dwy* v. *Connecticut Co.*, 89 Conn. 74, 99 (92 A. 883, L. R. A. 1915E, 800, Ann. Cas. 1918D, 270), express the tone and temper in which problems should be met:

" 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the Legislature.' "

This court has recognized the need to modify the common law with regard to the duty of landowners toward their invitees, *Holdshoe* v. *Whinery* (1968), 14 Ohio St. 2d 134, and *Mason* v. *Roberts* (1973), 33 Ohio St. 2d 29, and with regard to the product liability of manufacturers, *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227. It has also seen fit to allow suits against a charitably operated private hospital in *Avellone* v. *St. John's Hospital* (1956), 165 Ohio St. 467, and against a municipally operated hospital in *Sears* v. *Cincinnati* (1972), 31 Ohio St. 2d 157. Where is the justice in not allowing suits against a hospital operated by a state institution?

Since the rule of governmental immunity is judicially created, it can be judicially abrogated.[9] In view of the

---

[9]Some other jurisdictions have ruled similarly on the abolition of sovereign immunity: *Smith* v. *State* (1970), 93 Idaho 795, 473 P. 2d 937, 945; *Perkins* v. *State* (1969), 252 Ind. 549, 251 N. E. 2d 30, 34; *Brown* v. *Omaha* (1968), 183 Neb. 430, 160 N. W 2d 805, 808.

72

facts that the doctrine has been subjected to effective, widespread and unanswered criticism,[10] that it is out of step with contemporary notions of responsibility, and that its uneven application results in injustice, this court should abolish governmental immunity for the state, and the plaintiff herein should be able to go forward with her suit against University Hospitals.[11]

The majority herein refuses to grant relief primarily upon the basis of *Krause* v. *State, supra* (31 Ohio St. 2d 132), which stated in paragraphs one and two of the syllabus:

"1. The state of Ohio is not subject to suits in tort in the courts of this state without the consent of the General Assembly. (*Raudabaugh* v. *State*, 96 Ohio St. 513; *Palumbo* v. *Indus. Comm.*, 140 Ohio St. 54; *State, ex rel.*

[10]Prof. Borchard called the import of this rule from the British Isles as "one of the mysteries of legal evolution." Borchard, Governmental Responsibility for Tort, 34 Yale L. J. 1, 4.

Justice Traynor is a trifle more caustic:

"The rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia. * * *

"None of the reasons for its continuance can withstand analysis. No one defends total governmental immunity. In fact, it does not exist." *Muskopf* v. *Corning Hospital District* (1961), 11 Cal. Rptr. 89, 359 P. 2d 457, 460. For detailed and thorough criticism there are many journal articles and chapters in books. See the list compiled by Judge Gibson in *Hack* v. *Salem* 174 Ohio St. 383, 399-400, and a more recent list by Sindell, Sovereign Immunity—An Argument Con., 22 Cleveland State L. R. 55, 61-62.

[11]If there was any justification for the doctrine when Chief Justice Lane first announced it, there is none now. Ohio has grown from a small rural state, where today the population is 10,739,000 as of July 1, 1971, according to Department of Development. The state does many things other than actually govern. It constructs roads and bridges; it runs education institutions where there are various athletic facilities; it runs state parks with recreational facilities from swimming to golfing; it runs hospitals; and so on. There is no reason why the state, in its involvement in these fields like any business corporation, should be immune from suit. There are 56,768 state employees, the State Personnel Department reported, as of May 21, 1973. Justice is not being achieved when these people's acts are immune, merely because they work for the state.

*Williams* v. *Glander,* 148 Ohio St. 188; and *Wolf* v. *Ohio State Univ. Hospital,* 170 Ohio St. 49, approved and followed.)

"2. Section 16 of Article I of the Ohio Constitution, as amended September 3, 1912, abolished the defense of governmental immunity and empowered the General Assembly to decide in what courts and in what manner suits may be brought against the state."

Section 16, Article I of the Ohio Constitution, as amended September 3, 1912, provides:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. *Suits may be brought against the state, in such courts and in such manner, as may be provided by law.*" (Emphasis added.)

The syllabus in *Krause,* as quoted above, means that, although governmental immunity in Ohio was abolished by ratification of the 1912 Amendment to Section 16, Article I of the Ohio Constitution, suits still cannot be brought against the state without its consent. The very essence of sovereign immunity is that it is a shield to prevent suits being brought against the sovereign without his consent, as will be shown hereafter. Therefore, this distinction in *Krause* is meaningless and a tautology, and should not be followed as law. How the phrase, "suits may be brought against the state, in such courts and in such manner, as may be provided by law," can, in one breath, abrogate governmental immunity, and, in another breath reinstate it is nowhere explained in the *Krause* opinion.

There is no support for this distinction in the development of sovereign immunity in the English common law. One of the first recorded references to the doctrine is the maxim of Bracton "The King can do no wrong."[12] This

---

[12]The best answer for us is "* * * that the Revolutionary War abrogated the doctrine that the King can do no wrong * * *." *Stone* v. *Arizona Highway Comm.* (1963), 93 Ariz. 384, 381 P. 2d 107, 111.

did not mean that the King was above the law or that he could break it with impunity. Rather it meant that the King was not privileged to do wrong. If his acts were against the law, they were *injuriae* (wrongs). There was no intention to convey the idea that he was incapable of committing a legal wrong.[13]

Since the King was the fountain of justice and equity, he could not refuse to redress wrongs when petitioned to do so by his subjects. The *petition* and other special remedies were devised to afford a means of recovery for subjects because the customary writs could not be sued out against the King.[14] The remedy most frequently used was the *petition of right*. This was a prayer addressed to the King, Parliament, or Council in which recovery was requested for a wrong suffered at the King's hands. The right claimed in the petition had to be similar to the type recognized at law. The petition would be granted if the subject proved that he suffered a wrong which, if the case were between subject and subject, could be remedied by one of the ordinary writs. There is even some evidence that the Court of Exchequer had jurisdiction over equitable claims against the King.[15]

The scope of these remedies applied primarily to actions involving real property; but many of these actions, in contemporary law, would be considered as actions in tort or contract. Since the norm by which recovery was granted on the petition of right was the recovery by one subject vis-a-vis another, the forms of action developed as the general law did.[16]

So, in the history of the English common law there

[13]Borchard, Governmental Responsibility in Tort, 34 Yale L. J. 1, 2.

[14]Other remedies used were: petition of grace, writ of Liberate, traverse, monstrans de droit, petition to the Barons of the Exchequer. Holdsworth History of English Law, IX, pp. 7-45 (1926 Ed.). See, also, Pollock & Maitland, I History of English Law (1968 Ed.) 514-518.

[15]Holdsworth, at 30-32, citing *Pawlett* v. *Attorney General* (Exchequer 1668), 145 Eng. Rep. 550.

[16]Holdsworth, 41-42.

is no basis for the distinction in *Krause* that governmental immunity can be abolished and yet the state cannot be sued unless there is a consent-to-sue statute. The doctrine of sovereign immunity was developed essentially by a dialectic between the evolution of remedies by which wrongs could be redressed by the Crown and the more insistent demands by the Crown that it was immune from actions. These remedies needed to be devised, because ordinary writs did not lie against the Crown. This inability to use writs did not imply that there was a shield covering the King's wrongdoing (substantive immunity). In fact, the lawyers of the thirteenth century did not shrink from declaring that the King, either by himself or through his servants, had committed a wrong.[17]

So the history, far from supporting the distinction, indicates that the very essence of sovereign immunity was a lack of jurisdiction to sue the King in his courts (procedural immunity). For instance, when the immunity was waived and consent to sue was granted with regard to the King's officers, suit could be brought against them.[18] The history of the doctrine of sovereign immunity has revolved around the development of remedies by which the subject could recover against the Crown, not because the King was shielded from liability (substantive immunity) but because the law had to create ways to circumvent the inability to sue the King. The immunity operated more as a lack of jurisdiction in the King's courts than as a denial of total relief.[19]

Nor does the case law in Ohio support this miraculous distinction. The amendment to Section 16, Article I, has been construed many times in the 49 years since it was ratified, but the *Krause* decision was the first to interpret it as abolishing sovereign immunity and then immediately resurrecting it like the Phoenix. On the contrary, the sylla-

---

[17]Ehrlich, Vinogradoff, VI Oxford Studies in Social and Legal History, Proceedings Against the Crown (1216-1377), p. 14 (1921 Ed.).

[18]Ehrlich, *supra*, at 200.

[19]*Muskopf* v. *Corning Hospital District*, at 219.

bus of *West Park Shopping Center* v. *Masheter* (1966), 6 Ohio St. 2d 142, provides that:

"By reason of the doctrine of sovereign immunity, the state of Ohio cannot be sued without its consent."[20]

In Indiana, Section 24, Article IV of the Constitution, is similar to Ohio's Section 16, Artcile I. It provides:

"Provision may be made, by general law, for bringing suit against the state, as to all liabilities originating after the adoption of this Constitution; but no special act authorizing such suit to be brought, or making compensation to any person claiming damages against the state, shall ever be passed."

In *Perkins* v. *State* (1969), 252 Ind. 549, 251 N. E. 2d 30, the Supreme Court held that where the state was involved in proprietary functions, such as furnishing housing facilities in a state park, it was liable for injuries suffered there, and could be sued in court. This constitutional provision was not thought to bar a ruling on sovereign immunity, and it was summarily abolished with regard to the state and its agencies. At page 551, the court stated:

"We are dealing here not with a constitutional prohibition, but rather with a principle of common law which has its roots in the ancient common law of England which held 'The King can do no wrong' and hence could not be sued in any court of law."

The interpretation of sovereign immunity in *Krause* is not unique, however, for in *Holytz* v. *Milwaukee* (1962), 17 Wis. 2d 26, 115 N. W. 2d 618, the Supreme Court of Wisconsin held that governmental immunity was abrogated, but the state could not be sued unless the Legislature enacted a consent-to-sue statute. The Wisconsin constitutional provision, which is similar to Ohio's, reads:

---

[20]In *Raudabaugh* v. *State* (1917) 96 Ohio St. 513, Judge Jones held that sovereign immunity was a fundamental principle of law. And in *Palumbo* v. *Indus. Comm.* (1942), 140 Ohio St. 54, the cases of *State* v. *Franklin Bank* (1840), 10 Ohio 91, and *Miers* v. *Turnpike Co.* (1842), 11 Ohio 273, are cited as authority for the governmental immunity of the state. The constitutional amendment is the object of discussion only to determine whether it was self-executing or not.

"The Legislature shall direct by law in what manner and in what courts suits may be brought against the state." Section 27, Article IV.

That decision cannot be relied on as support for *Krause* because a distinction between procedural and substantive immunity is crucial to its outcome. The Wisconsin court held that: "Henceforward, there will be substantive liability on the part of the state, but the right to sue the state is subject to sec. 27, Art. IV of the Wisconsin Constitution * * * ."

From the survey of the historical development presented above, it is clear that sovereign immunity included at least procedural immunity; and if a court abrogated sovereign immunity for the state and claimed that the procedural immunity remained, it misstated and misapplied the principle of law. It is a vain and useless act to abolish an immunity that is still operative in another way.[21]

Crucial to the decision in *Krause* was an interpretation of Section 16, Article I of the Ohio Constitution. It is not deemed useful to embark on another venture construing this section. Whether the amendment is construed as self-executing, or not self-executing, as *Krause* holds, does not affect a decision of this court to abolish governmental immunity. If the amendment was intended to be self-executing, the court would merely be achieving the same effect that was intended 50 years ago when the immunity amendment was ratified. If, on the other hand, the amendment was not intended to be self-executing and merely informed the General Assembly that it was empowered to abolish

---

[21] The California court in *Muskopf* v. *Corning Hospital District*, 55 Cal. 2d 211, at 217, notes: "Previous cases, however, have differentiated between the state's consenting to sue and its substantive liability, and have held that the language used in section 32121, subsection (b), and in article XX, section 6 gives only the state's consent to be sued and does not waive any defenses or immunities." Here, too, the courts had misapplied the doctrine of sovereign immunity. Indeed, nowhere in the decision does the learned Justice Traynor embrace the distinction. Here the court held that a governmental agency operating a hospital could be sued for the alleged neglignce of its staff in treating a patient.

governmental immunity, the court's decision to abolish governmental immunity would merely execute the abolition by an alternative method—for the court has authority to change a judicially-created rule.

There is no justification for the fear that a clear abolition of the doctrine of governmental immunity will bring down an avalanche of suits against state officers, seriously affecting the performance of their duties in governing. The specific protection for the actions involved in the process of governing can be detailed when a majority of this court decides to remove this unjust shield. Either of two procedures would be adequate. This court could remove the immunity in a case-by-case, piecemeal fashion, as the Supreme Court of New Jersey has done.[22] There are some drawbacks to this procedure, such as lack of predictability and reliability for the government, as well as the legal profession. The other procedure is for the General Assembly to spell out the types of governmental acts where immunity is provided in a logical scheme. These immunities then could not be abolished by this court because they were legislatively, not judicially, created. Such a plan would remedy the inconsistencies and the lack of predictability that could result from the piecemeal abolition.

[22]For instance, *P. T. & L. Construction Co.* v. *Commr. of Transportation* (1970), 55 N. J. 341, 262 A. 2d 195, and *Willis* v. *Dept. of Conservation* (1970), 55 N. J. 534, 264 A. 2d 34.