[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 376.]

COMMUNITY INSURANCE COMPANY, APPELLANT, *v*. OHIO DEPARTMENT OF
TRANSPORTATION, APPELLEE.

[Cite as *Community Ins. Co. v. Ohio Dept. of Transp.*, 2001-Ohio-208.]

*Insurance—Insurer who has been granted right of subrogation by person on whose
behalf insurer has paid medical expenses incurred as the result of tortious
conduct of the state is subject to R.C. 2743.02(D).*

(No. 00-771—Submitted January 30, 2001—Decided July 25, 2001.)

APPEAL from the Court of Appeals for Franklin County, No. 99AP-746.

_____

**MOYER, C.J.**

{¶ 1} Rachelle Dronebarger suffered catastrophic and permanent injuries in a one-vehicle automobile accident when her motor vehicle collided with a pole on Interstate 77 in northeast Ohio. She suffered spinal cord and other injuries resulting in partial quadriplegia and partial amputation of the right leg. After the accident, Community Mutual Insurance Company ("Community")[1] paid medical and hospital expenses of over $245,000 pursuant to an employee health plan under which Dronebarger was insured.

{¶ 2} In 1994, Community filed a complaint, as Dronebarger's subrogee, in the Court of Claims, seeking judgment against appellee, Ohio Department of Transportation ("ODOT"), for the same amount it had paid on Dronebarger's claim. Community asserted that ODOT had been negligent in placing and maintaining the unguarded fixed-based pole with which Dronebarger collided rather than placing a breakaway or frangible-base pole, in violation of ODOT's own rules and regulations,

---

1. Community Insurance Company, appellant herein, is the successor in interest to Community Mutual Insurance Company.

and that Dronebarger's medical expenses were the direct and proximate result of that negligence.

{¶ 3} Dronebarger filed a separate lawsuit against ODOT, also alleging negligence, and also seeking damages. The court there found that Dronebarger's damages, representing future medical expenses, lost wages, and loss of enjoyment of life, including pain and suffering, totaled $8.3 million. It entered judgment in her favor in the amount of sixty percent of that total, for an actual award to Dronebarger of nearly $5 million.

{¶ 4} Similarly, in the subrogation case at bar, the court tried the issues of liability and damages separately, and determined that Dronebarger's negligence had combined with the negligence of ODOT to produce her injuries. It allocated forty percent of the fault to Dronebarger and sixty percent to ODOT.

{¶ 5} Community argued that it was entitled to recover sixty percent of its paid claims from ODOT, or just over $147,000. The trial court agreed, and entered judgment against ODOT and in favor of Community in that amount.

{¶ 6} In a split decision, the court of appeals overruled its prior holding in *Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp.* (1976), 2 O.O.3d 27. Accordingly, the court of appeals reversed the judgment of the Court of Claims, and remanded the cause with instructions that judgment be rendered in favor of ODOT, thereby rejecting Community's subrogation claim.

{¶ 7} The cause is now before this court upon the allowance of a discretionary appeal.

{¶ 8} The parties disagree as to the proper construction of R.C. 2743.02, which provides:

"(D) Recoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant."

**{¶ 9}** Community argues that R.C. 2743.02(D) does not mandate a reduction in its subrogation claim against the state in that it, Community, has not received collateral benefits from any collateral source. It argues that Dronebarger's receipt of over $245,000 as a collateral recovery from Community is irrelevant in Community's subrogation suit against the state, even though Dronebarger clearly received "insurance proceeds, disability award, or other collateral recovery" in that amount.

**{¶ 10}** Implicit in Community's argument is the premise that it is a "claimant" as that term appears in R.C. 2743.02(D), separate and apart from Dronebarger. However, Community's argument contradicts the basic principles underlying the legal concept of subrogation. Community is not a claimant separate and apart from its subrogor. Rather, Community stands in the place of Dronebarger in seeking recovery from the state, and has no greater right to recovery than would Dronebarger herself. See *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 537 N.E.2d 624, paragraph one of the syllabus. Community's recognition that its recovery should be reduced by the forty percent of fault allocated to Dronebarger is consistent with this principle.

**{¶ 11}** R.C. 2743.02(D) mandates that medical benefits Dronebarger received from Community must be deducted from the amount due her from the state. She could not transfer to Community, by way of subrogation, a right to recover damages representing incurred medical expenses that she herself did not possess pursuant to R.C. 2743.02(D).

**{¶ 12}** Community contends that the state should bear the medical costs incurred by an injured person as between it (a medical insurer) and the state (here adjudicated to be a tortfeasor). It bases this contention on its belief that the purpose of R.C. 2743.02(D) is to preclude injured persons from receiving double recovery, rather than to simply reduce the state's ultimate liability. However, we find no ambiguity in the language of the statute. The case at bar involves only one claimant,

Rachelle Dronebarger, even though she contractually agreed to subrogate a portion of her claim against the state to Community.

{¶ 13} We have previously recognized that the state's purpose in waiving political subdivision immunity was twofold: to compensate uninsured victims while also preserving public resources. The "state can make the rational determination to permit recovery by an unprotected victim but deny subrogation to insurance carriers who can make actuarial computations and adjust premiums to compensate for payments to policyholders who suffer damage at the hands of a political subdivision." *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181, 183.

{¶ 14} Even if it were appropriate in this case to inquire into legislative intent to resolve a statutory ambiguity, we find no support for concluding that the General Assembly intended that subrogation claims against the state should be treated differently from subrogation claims against political subdivisions. Nor do we believe that R.C. 2743.02(D) was intended to operate in such a way as to shift financial risk to the state and away from insurers, such as Community.

{¶ 15} We therefore hold that an insurer who has been granted a right of subrogation by a person on whose behalf the insurer has paid medical expenses incurred as the result of tortious conduct of the state is subject to R.C. 2743.02(D), which mandates reduction in recoveries against the state by the "aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant."

{¶ 16} The judgment of the court of appeals is therefore affirmed.

*Judgment affirmed.*

COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., concurs in judgment only.

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., dissent.

———————————

**DOUGLAS, J., dissenting.**

4

{¶ 17} I must respectfully dissent. The majority concludes that R.C. 2743.02(D) bars subrogation actions brought by insurers against the state. The majority holds that an insurer cannot have an independent claim, based upon a subrogation agreement with their insured, for damages against the state. I disagree.

I

{¶ 18} The majority states that it finds "no support for concluding that the General Assembly intended that subrogation claims against the *state* should be treated differently from subrogation claims against *political subdivisions*." (Emphasis added.) However, today's decision ignores the state's waiver of immunity in R.C. 2743.02(A)(1), which provides:

"The state hereby waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same *rules of law applicable to suits between private parties*, except that the determination of liability is subject to the limitations set forth in this chapter * * *."[2]  (Emphasis added.)

{¶ 19} Thus, it is difficult to understand why the majority would draw a parallel between suits against the state to those against political subdivisions, when we are clearly directed by R.C. 2743.02(A)(1) to follow the law that applies to suits between private parties. In other words the majority should have viewed the state as a private party, not as a governmental entity. Hence, the only question that should be before this court is whether Community could sue a private party on the same basis that it now sues the state. I would answer in the affirmative.

{¶ 20} As set forth in the majority opinion, R.C. 2743.02(D) provides that all recoveries against the state shall be reduced by the aggregate of insurance proceeds recovered by the claimant. Community argues that it is the sole claimant

---

2. These limitations on the determination of liability are not relevant in this case because liability is not an issue in the case. The state has already been found to be a tortfeasor, and thus liability has already been determined. The issue before us is one of damages and whether an award of damages can properly be limited or reduced.

with regard to the past medical expenses paid on Dronebarger's behalf. Community contends that R.C. 2743.02(D) has no application to its claim, since, as a claimant, it has not received any collateral benefits. Community supports its argument by relying on the now overruled court of appeals opinion in *Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp.* (1976), 2 O.O.3d 27, which held that R.C. 2743.02(D) does not bar an insurer's subrogation claim against the state. I agree with Community, and I would find that *Lumbermens* was properly decided.

{¶ 21} In order to bring a cause of action, a claimant (Community in the case now before us) must satisfy Civ.R. 17(A), which provides, "Every action shall be prosecuted in the name of the real party in interest." A real party in interest is " 'one who has a real interest in the subject matter of the litigation, and not merely an interest in the action itself, *i.e.*, one who is *directly* benefitted or injured by the outcome of the case.' " (Emphasis *sic*.) *Shealy v. Campbell* (1985), 20 Ohio St.3d 23, 24, 20 OBR 210, 211, 485 N.E.2d 701, 702, quoting *W. Clermont Edn. Assn. v. W. Clermont Bd. of Edn.* (1980), 67 Ohio App.2d 160, 162, 21 O.O.3d 457, 458, 426 N.E.2d 512, 514. If an insurer has paid only part of a claim, both the insurer and the insured have substantive rights against the tortfeasor that qualify them as real parties in interest. *Cleveland Paint & Color Co. v. Bauer Mfg. Co.* (1951), 155 Ohio St. 17, 24-25, 44 O.O. 59, 62, 97 N.E.2d 545, 548-549, citing *United States v. Aetna Cas. & Sur. Co.* (1949), 338 U.S. 366, 380-381, 70 S.Ct. 207, 215, 94 L.Ed. 171, 185. In cases of subrogation where an insurer has paid only part of the loss suffered by an insured, the insurer may alone bring a cause of action as the real party in interest. *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. at 381, 70 S.Ct. at 215-216, 94 L.Ed. at 185.

{¶ 22} There is no dispute that Community has a real interest in $147,000 of the $245,000 that it paid in benefits on Dronebarger's behalf. Pursuant to Dronebarger's contract of insurance with Community, Community was entitled to recover the payments it made on her behalf. Thus, Community is a real party in

interest, pursuant to Civ.R. 17(A), to the claim for those past medical expenses paid. Accordingly, Community is the proper claimant in this suit against ODOT for the recovery of those payments made by Community, and, in fact, Dronebarger is not even a party in the case at bar. Thus, since Community did not receive any *insurance proceeds, disability award, or other collateral recovery* against the payments that it made on Dronebarger's behalf, there is no basis to apply R.C. 2743.02(D) to Community's claim. Based upon the foregoing, I believe that the court in *Lumbermens Mut. Cas. Co.*, 2 O.O.3d 27, properly decided this issue.

{¶ 23} Disregarding the rationale of *Lumbermens*, the majority relies upon *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181, a case in which the defendant was a political subdivision—not the state. In addition, the majority implicitly relies upon R.C. 2744.05(B) in determining the intent of R.C. 2743.02(D). However, R.C. 2744.05(B) and *Menefee* relate to suits against political subdivisions, and R.C. 2743.02(D) applies to suits against the state. The purposes of R.C. Chapters 2743 and 2744 could not be more distinct.

{¶ 24} R.C. 2743.02(A)(1) *allows suits* to be brought against the state. In contrast, the Political Subdivision Tort Liability Act *grants immunity* to political subdivisions. See R.C. 2744.02(A)(1).

{¶ 25} In addition, R.C. 2743.01 further distinguishes the state from political subdivisions when it defines the two entities. R.C. 2743.01(A) provides:

" 'State' means the state of Ohio, including, but not limited to, the general assembly, the supreme court, the offices of all elected state officers, and all departments, boards, offices, commissions, agencies, institutions, and other instrumentalities of the state of Ohio. 'State' does not include political subdivisions."

{¶ 26} Clearly, R.C. Chapters 2743 and 2744 involve different entities and raise different issues. R.C. Chapter 2743 waives state immunity. R.C. Chapter 2744 grants immunity to political subdivisions.

**{¶ 27}** *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181, does not support the majority's conclusion that R.C. 2743.02(D) and 2744.05(B) serve the same purpose. In *Menefee*, an insurer and its insured sued a political subdivision for an accident involving a bus owned by the political subdivision. The trial court, on the insured's claim, entered judgment in favor of the insured in the amount of the insured's deductible. However, the trial court relied upon R.C. 2744.05(B) to determine that the insurer was not entitled to recovery. R.C. 2744.05(B) provides:

"If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. *No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to such benefits.*" (Emphasis added.)

**{¶ 28}** Finding that R.C. 2744.05(B) was unconstitutional, the court of appeals in *Menefee* reversed the trial court's decision. We, in turn, reversed the court of appeals. We held that R.C. 2744.05(B) did not violate equal protection because R.C. 2744.05(B) was rationally related to serving two legitimate state interests. Those interests were found to be the conserving of fiscal resources of political subdivisions by limiting their tort liability and, second, permitting injured persons who have no other source of reimbursement for their damages to recover for a tort committed by political subdivisions. *Menefee v. Queen City Metro*, 49 Ohio St.3d at 29, 550 N.E.2d at 182.

**{¶ 29}** In relying on *Menefee* herein, the majority states, "We have previously recognized that the state's purpose in waiving *political subdivision immunity* was twofold: to compensate uninsured victims while also preserving public resources." *Id.* This statement clearly spells out the majority's confusion

8

on the subject of immunity. First, the statement is irrelevant to the case at bar, as neither party is a *political subdivision*. Second, the state has not *waived* political subdivision immunity. Quite the contrary. The state, by enacting R.C. Chapter 2744, has specifically *provided* immunity to political subdivisions. Third, the court in *Menefee* held only that R.C. 2744.05(B) was rationally related to a legitimate state interest. *Menefee* made no comparison between R.C. 2743.02(D), the statute now before us, and R.C. 2744.05(B), and certainly there is no suggestion that R.C. 2743.02(D) was enacted to serve a statutory purpose similar to that of R.C. 2744.05(B). Finally, the parallel drawn by the majority between R.C. 2743.02(D) and 2744.05(B) is flawed. R.C. 2744.05(B) expressly bars subrogation claims, and R.C. 2743.02(D) does not. Thus, *Menefee* cannot be interpreted as supporting the contention that R.C. 2743.02(D) bars subrogation claims against the state.

{¶ 30} ODOT argues that the purpose of R.C. 2743.02(D) is not to make insurers whole but to make injured parties whole. ODOT supports this conclusion by citing *Van Der Veer v. Ohio Dept. of Transp.* (1996), 113 Ohio App.3d 60, 66, 680 N.E.2d 230, 234, wherein the court of appeals stated that "all victims are compensated, either by insurance, by an award against the state, or a combination of the two." However, the majority herein fails to recognize that the reimbursement section of the contract between Community and Dronebarger requires that "[i]f you [Dronebarger] recover damages from any party or through any coverage named above, you must hold in trust for us [Community] the proceeds of the recovery and must reimburse us to the extent of payments made." Community makes it crystal clear that it has the right to seek reimbursement from Dronebarger to be paid out of proceeds of any recovery she obtains. In addition, the contract requires reimbursement "to the extent of payments made" and does not restrict reimbursement to the extent that Dronebarger

could recover damages, *i.e.,* the extent to which Dronebarger was not comparatively negligent.[3]

{¶ 31} Thus, as a result, Community can recover from Dronebarger the *entire* amount of past medical expenses it has paid on her behalf. In light of this, Dronebarger would no longer be made whole or have full compensation as contended by ODOT. Contrary to ODOT's assertions, Community collects a windfall only if ODOT prevails. Accordingly, the result of the majority's decision is that Community may now recover, through reimbursement from Dronebarger, the entire amount paid by it to Dronebarger for past medical payments made. Conversely, if Community had prevailed in this claim, it could collect only to the extent that it was a real party in interest, that is, $147,000, which is sixty percent of the past medical expenses paid by Community. Thus, Dronebarger, the victim of ODOT's negligence, may now have to pay the entire amount of past medical expenses out of her recovery against ODOT. Finally, ODOT, the tortfeasor, pursuant to R.C. 2743.02(D), escapes liability for the full amount of damages that result from its negligent conduct. This conclusion hardly supports the contention that R.C. 2743.02(D) provides full compensation for injuries that result from the state's negligence. Clearly, the majority's interpretation of R.C. 2743.02(D) is inconsistent with a waiver of immunity, since the injured party may not receive a full recovery and the state escapes full liability for its tortious acts.

II

---

3. In *Strief v. Cincinnati* (1995), 72 Ohio St.3d 318, 319-320, 649 N.E.2d 1227, 1228, with Chief Justice Moyer writing for the court, we found, under nearly identical facts, that if "Strief were required to repay the benefit plan and also have the amount deducted from the award against the city, she would in fact be paying that portion of her medical costs and disability benefits twice, and the city would escape that portion of its liability to Strief." *Strief* involved the interpretation of R.C. 2744.05(B), and we held that Strief's receipt of compensation from her "union benefit fund is not a 'benefit' to be set off by the city under R.C. 2744.05(B); instead, it is in the nature of a 'conditional loan.' " *Id.* at 320, 649 N.E.2d at 1228. I recognize, of course, that *Strief*, like *Menefee*, is a political subdivision case and has no applicability to the case now before us, which is one involving the state. I make the point only because the majority cites *Menefee* but, for some unexplained reason, does not cite *Strief*.

**{¶ 32}** R.C. 2743.02 was enacted and effective on January 1, 1975. *Lumbermens Mut. Cas. Co.* was decided on January 20, 1976. Judge Holmes, writing a separate concurrence in *Lumbermens*, stated, "If it be the legislative intent to establish the state policy that, under the limited waiver of governmental immunity of this chapter, a subrogated insurer should not be permitted to sue the state of Ohio, then I believe it to be necessary to spell out such policy in this chapter of law." 2 O.O.3d at 29. Since 1976, when *Lumbermens* was decided, R.C. 2743.02 has been amended on six occasions, but the language of R.C. 2743.02(D) under consideration has not been substantively changed.[4] The General Assembly has not incorporated language barring insurance subrogation claims against the state, despite having done so for claims against political subdivisions, through the enactment of R.C. 2744.05(B), on November 20, 1985. Thus, the General Assembly's failure to change R.C. 2743.02(D) to correspond to R.C. 2744.05(B) clearly indicates that it does not desire to bar subrogation claims against the state. For these reasons I believe that the majority has misapplied the intent of these statutes and has reached a conclusion that is clearly outside the plain and ordinary meaning of R.C. 2743.02(D).

### III

**{¶ 33}** While I am troubled by the majority's misguided interpretation of R.C. 2743.02(D), I am equally concerned with the willingness of Community and this court to accept that R.C. 2743.02(D) is a constitutionally permissible limitation on the state's obligations. During arguments before this court, Community freely accepted the premise that the General Assembly had the constitutional authority to waive the state's immunity and, at the same time, to limit the state's obligations. This seems

---

4. In *Menefee*, this court recognized that the General Assembly is capable of responding to judicial decisions. The General Assembly enacted R.C. Chapter 2744 in response to the decision in *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749, paragraph two of the syllabus, which held, "The defense of sovereign immunity is not available, in the absence of a statute providing immunity, to a municipal corporation * * *."

strange, given the language of Section 16, Article I, Ohio Constitution. That section provides:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. *Suits may be brought against the state*, in such courts and in such manner, as may be provided by law." (Emphasis added.)

{¶ 34} The second sentence of Section 16, Article I, Ohio Constitution, authorizing suits against the state, was added as an amendment to the state Constitution on January 1, 1913. The legislature has the delegated authority, pursuant to Section 16, Article I, Ohio Constitution, to determine the *manner* in which suits are brought. "Manner" means "[a] way, mode, method of doing anything, or mode of proceeding in any case or situation." Black's Law Dictionary (6 Ed.1990) 963. In addition, Webster's defines "manner" as "the mode or method in which something is done or happens: a mode of procedure or way of action." Webster's Third New World Dictionary (1986) 1376. In each of these definitions it is apparent that "manner" relates to a procedure by which something is carried out. It is clear that "manner" dictates *how* something may be accomplished and not *whether* something may be accomplished.

{¶ 35} Thus, I believe that Section 16, Article I merely permits the General Assembly to devise the procedure by which persons may sue the state and the courts where those actions may be brought. Section 16, Article I did not give the General Assembly authority to limit suits against the state. The clear intent of the authors of this constitutional provision was to delegate to the General Assembly the purely procedural matters of determining the venue for claims against the state and the procedure for adjudicating such claims.

{¶ 36} The delegates to the 1912 Ohio Constitutional Convention intended, through the amendment of Section 16, Article I, to abrogate sovereign immunity without the need for an independent legislative enactment. Delegate Wybrecht, the

amendment's sponsor, stated that it "recognizes the right of the individual to seek redress for claims against the state in such courts as may hereafter be designated, without petitioning the legislature as is now the custom." 2 Proceedings and Debates of the 1912 Ohio Constitutional Convention (1912) 1431. In addition to drafting the amendment to Section 16, Article I, the delegates also drafted a description of the amendment. The following language was adopted to describe to the citizens of Ohio the purposes of the amendment: "If adopted, it will authorize individuals to bring suit against the state the same as against private persons in such courts and in such manner as may be provided by law." *Id.* at 2028. During the debate on this description, Delegate Hoskins inquired whether the explanation to Section 16, Article I conveyed "the idea that legislation is necessary to confer that right, or is the right given by this article itself? * * * The amendment says that the legislature shall provide the method of bringing suit. *Will the amendment itself confer the right to bring the suit?*" (Emphasis added.) *Id*. In response, Delegate Peck stated, "The amendment does confer that right." *Id*. Accordingly, the delegates clearly expressed and understood that Section 16, Article I was self-executing.

{¶ 37} A determination that Section 16, Article I, Ohio Constitution is self-executing is consistent with the intent expressed by Delegate Wybrecht when he first introduced the amendment to the convention:

"Why should the state demand of her citizenship a certain line of conduct in the settlement of disputes between individuals, partnerships or corporations, and hold herself aloof from the operation of her laws? * * *

"Let the state exemplify by this constitutional provision her willingness to submit to every enactment she imposes on the citizen. Let the state indicate by the adoption of this proposal that the same restrictions—the demands of the industrial establishments within her borders—must apply to the numerous charitable and penal institutions under her management. The thousands of employes in these institutions are entitled to the same protection of life and limb in their various avocations—many

of them hazardous—as are the workmen in any manufacturing plant in the state, and, in case of injury, just compensation determined after a fair and impartial trial, and not as such cases are usually disposed of by the legislature—a settlement based upon charity and doubt.

"If we want to get the government back to the people, make it responsive to their ideals of equal and exact justice. Let the humblest citizen feel that while the state can impose on him all the duties of citizenship, taxation, obedience to law and the common defense, he is the equal of the sovereign before the law." *Id*. at 1431.

{¶ 38} During the third reading of the amendment to Section 16, Article I, delegates accepted that the amendment was self-executing. As evidence of this, Delegate Woods, an opponent of the amendment stated, "I am against this proposal * * *. Every time there is a flood from one of the canals the state will have a whole lot of lawsuits on its hands." *Id.* at 1919. Delegate Woods further stated in opposition, "The cases will have to be tried by juries in the local county and the idea will be that 'The state has a lot of money and we will make the state pay.' " *Id.* Delegate Woods, through his comments, recognized the self-executing nature of the amendment by stating that he believed that the proposal *itself* provided for lawsuits against the state. Despite Delegate Woods's opposition, the amendment passed without further change, by a vote of eighty-eight to six. *Id.* at 1960.

{¶ 39} Nevertheless, within five years after the amendment was adopted, this court held in *Raudabaugh v. State* (1917), 96 Ohio St. 513, 118 N.E. 102, paragraph two of the syllabus, that the amendment to Section 16, Article I was not self-executing. *Raudabaugh* found that statutory authority was required as a prerequisite to bringing suit against the state. At the time of the *Raudabaugh* decision, the General Assembly had not enacted any legislation regarding in what courts and in what manner the state may be sued.

{¶ 40} *Raudabaugh* relied exclusively upon the interpretation of other similar state constitutional provisions as interpreted by their state supreme courts. However,

entirely absent from the analysis in *Raudabaugh* was reference to the proceedings and debates of the 1912 Ohio Constitutional Convention. *Raudabaugh* found that since Section 16, Article I was similar to other states' constitutional provisions, "it may be presumed that the constitutional convention at the time knew of the construction given them by their respective courts." *Id.*, 96 Ohio St. at 516, 118 N.E. at 103. However, we can only speculate that had the court in *Raudabaugh* reviewed the historical documents of the debate, it would have found that Section 16, Article I was intended to unconditionally abrogate the state's sovereign immunity.

**{¶ 41}** *Krause v. State* (1972), 31 Ohio St.2d 132, 60 O.O.2d 100, 285 N.E.2d 736, paragraph one of the syllabus, followed the holding of *Raudabaugh*. However, *Krause* did recognize that Section 16, Article I should be interpreted in light of its history. In particular, *Krause* cited Delegate Peck's statement during the debates that the amendment itself did confer the right to sue the state. *Krause,* 31 Ohio St.2d at 137, 60 O.O.2d at 103, 285 N.E.2d at 739-740, citing 2 Proceedings and Debates (1912), at 2028. Yet *Krause* also relied upon the interpretation of other state constitutions by the respective state courts and thereby found a reason not to disturb the holding of *Raudabaugh*. Even though *Raudabaugh* ignored and *Krause* minimized the actual statements of the delegates and instead relied upon the assumed intent of other state constitutions, those cases today are used as precedent for the proposition that Section 16, Article I is not self-executing. Following precedent is important, but when we find precedent to be in error, we should, like the United States Supreme Court, say so and make the appropriate changes.

**{¶ 42}** In *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 142-143, 624 N.E.2d 704, 707-708, Justice Pfeifer recognized the error. Discussion by the delegates at the convention "confirms that the right to sue the state was conveyed to Ohioans in the amendment, and that the legislature would have no role in determining the scope of this right." *Id.* at 144, 624 N.E.2d at 708 (Pfeifer, J., concurring). See, also, *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 670, 653 N.E.2d 1186, 1189

(Pfeifer, J., dissenting). While I agree with the conclusions Justice Pfeifer reached in *Garrett* and *Fahnbulleh*, I must gently part ways with the analysis he applied.

{¶ 43} In both *Garrett* and *Fahnbulleh* the state of Ohio was not a defendant. The defendants were *political subdivisions*. As set forth above, clearly the state and political subdivisions are not interchangeable. In *Garrett* and *Fahnbulleh*, Justice Pfeifer refers to the second sentence in Section 16, Article I, which provides, "Suits may be brought against the *state*, in such courts and in such manner, as may be provided by law." (Emphasis added.) Neither *Garrett* nor *Fahnbulleh*, however, involved a suit against the *state*. Thus, since the second sentence in Section 16, Article I authorizes suits against the state, it has no application to suits against political subdivisions.[5]

{¶ 44} In the case now before us, the General Assembly, pursuant to R.C. 2743.02(D), has attempted to limit the financial responsibility of the state as a negligent tortfeasor. Given the foregoing, I believe that Section 16, Article I, Ohio Constitution, by its own terms, abrogates sovereign immunity, and, accordingly, the General Assembly has no authority, constitutional or otherwise, to limit suits against the state. Therefore, I conclude, for this additional reason, that R.C. 2743.02(D) is an invalid exercise of legislative authority as being in violation of Section 16, Article I of the Ohio Constitution.

{¶ 45} In conclusion, what precedents have we set with this decision? Today's decision will be used for the proposition that the General Assembly enacted R.C. Chapters 2743 and 2744 with the intent that both chapters serve the same purpose. It will be used, despite the plain and express statutory language of R.C. 2743.01(A) that distinguishes between the state and political subdivisions, to make an

---

5. Given the first sentence of Section 16, Article I, Ohio Constitution which provides access to courts and the right to remedy, I believe it to be a proper conclusion that political subdivisions are not entitled to immunity. For a general discussion of political subdivision immunity, see *Butler v. Jordan* (2001), 92 Ohio St.3d 354, ___ N.E.2d ___, and *Gladon v. Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 662 N.E.2d 287 (Douglas, J., dissenting).

argument that these entities are synonymous. It will be used to say that R.C. 2743.02(D), which is entirely silent on the subject, bars subrogation claims brought by an insurer to the same extent as provided by R.C. 2744.05(B), which expressly bars subrogation claims. It will be used to say that when the delegates to the Ohio Constitutional Convention of 1912 stated that Section 16, Article I of the Ohio Constitution itself conferred the right of a citizen to sue the state, those delegates and the language they chose really did not mean what was said, but, instead, what they really meant was that the General Assembly has reserved unto itself powers that override the Ohio Constitution. It will be used to say that even when a statute waives the state's immunity, the same statute may, nevertheless, be interpreted to limit the state's responsibilities for its negligent acts and the harm done to its citizens. The Greek biographer Diogenes Laertius, of the early third century, said, "Bury me on my face," and when asked why, he replied, "Because in a little while everything will be turned upside down." Bartlett, Familiar Quotations (11 Ed.1947) 1015. *Nil agit exemplum litem quod lite resolvit*: a precedent accomplishes nothing if it settles one dispute by raising another. Today we have raised more questions than we have answered. Accordingly, I respectfully dissent.

F.E. SWEENEY and PFEIFER, JJ., concur in the foregoing dissenting opinion.

─────────────────

*Kreiner & Peters Co., L.P.A.*, and *Gilbert E. Blomgren*, for appellant.

*Betty D. Montgomery*, Attorney General, *William C. Becker* and *Susan M. Sullivan*, Assistant Attorneys General, for appellee.

─────────────────